```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


In re:                                :
                                           Docket #1:21-cv-02587-
 FLYNN, et al.,                       : GHW-SLC

                    Plaintiffs,       :

  - against -                         :

 CABLE NEWS NETWORK, INC.,            : New York, New York
                                        October 14, 2021
                    Defendant.        :
                                        MOTION HEARING
------------------------------------- :


                     PROCEEDINGS BEFORE
               THE HONORABLE SARAH L. CAVE,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          STEVEN S. BISS, ESQ.
                        300 West Main Street
                        Charlottesville, Virginia 22903


For Defendants:         DAVIS WRIGHT TREMAINE LLP
                        BY:  KATHERINE MARY BOLGER, ESQ.
                        1251 Avenue of the Americas
                        New York, New York 10020




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

### INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|

None

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

| | PROCEEDINGS | 3 |

```
 1                          PROCEEDINGS                    3

 2               THE CLERK:  Your Honor, this is in the matter of

 3     Flynn et al versus Cable News Network, Inc., 21-civil-2587.

 4               Counsel, please state your appearance for the

 5     record.

 6               MR. STEVEN S. BISS:  Judge, good morning.  I'm

 7     Steve Biss.  I represent the plaintiffs.

 8               HONORABLE SARAH L. CAVE (THE COURT):  Okay.  Good

 9     morning.

10               MS. KATHERINE M. BOLGER:  Good morning, your

11     Honor.  I'm Katherine Bolger; I represent the defendants.

12               THE COURT:  Okay.  Good morning to both of you.

13               So it's a little hard for all of us to hear with

14     our masks on, but I'll try to do my best to be clear if you

15     can do the same.

16               So we're here this morning on CNN's motion to

17     dismiss the amended Complaint.  And so, Ms. Bolger, would

18     you like to start?

19               MS. BOLGER:  I would, your Honor.  Before I

20     start, I have one sort of silly housekeeping matter.

21               THE COURT:  Yes.

22               MS. BOLGER:  I noticed last night while I was

23     flipping through the exhibits nervously that the CMS tag

24     had covered some of the exhibits.  So I brought new copies.

25     I've already given Mr. Biss a copy, but I wondered if I
```

```
 1                          PROCEEDINGS                    4

 2  could just hand these up to you all.

 3           THE COURT:  That's fine.  Thank you for noticing

 4  that.

 5           And, actually, then, before you get -- since we're

 6  talking about exhibits, before you get started, so I don't

 7  interrupt your flow, in footnote two of the amended

 8  complaint, the Flynns allege that on July 7, 2020, CNN

 9  published the video.  And then there are two links there,

10  and it refers to an accompanying article written by

11  Marshall Cohen.  I didn't see that Cohen article among the

12  exhibits.  Did I miss it or --

13           MS. BOLGER:   No, your Honor, we -- it's not the

14  reported issue in the dispute, and we did not rely on that.

15           THE COURT:  Okay.

16           MS. BOLGER:   Although we would take the position

17  that it, like everything else, is incorporated in the

18  complaint.

19           THE COURT:  Okay.  I just wanted to make sure I

20  hadn't missed something.

21           Okay, go ahead, Ms. Bolger.

22           MS. BOLGER:   Your Honor, this is a defamation

23  action that arises out a CNN report in which the plaintiffs

24  are not named, are not discussed and don't speak and aren't

25  the subject of the report.  In fact, they're only shown in
```

1                              PROCEEDINGS                    5

2   two seconds of a clip that plaintiff Jack Flynn himself had

3   posted previously on Twitter.  In those few seconds of the

4   clip Jack Flynn's brother, General Michael Flynn, recites

5   the QAnon's words, "Where we go one, we go all."

6            THE COURT:  Can I just stop you there?  So you say

7   that Mr. Flynn himself, Jack Flynn, posted the video?  I

8   know that the amended complaint alleges that General Flynn

9   posted the video, but you're saying that Jack Flynn himself

10  also posted the video to Twitter?

11           MS. BOLGER:  He did, your Honor.  And, actually,

12  Exhibit 9, which I just handed up to you, is Mr. Flynn's

13  Twitter.  And you'll see not only did he post the video,

14  but he says, "#take the oath happy fourth of July," and

15  then he lists a bunch of other Twitter handles.  So that is

16  Jack Flynn's Tweet -- it's from July 5, 2020 -- of the

17  video that is of Mr. Flynn and his family saying the words,

18  "Where we go one, we go all."

19           THE COURT:  Well, this is a re-Tweet of General

20  Flynn's Tweet, right?

21           MS. BOLGER:  Yes.

22           THE COURT:  Okay.  And is the whole video

23  attached?  This is just an image, but obviously, it's a

24  printout, so maybe that's why I can see; but was it the

25  whole video attached or just the image?

```
 1                          PROCEEDINGS                        6

 2                MS. BOLGER:   Yes, your Honor.  And then,

 3    actually, in the amended complaint on page -- one

 4    second -- page 13, this is the plaintiff's own complaint.

 5    You see there's a printout, and then the sort of fourth

 6    Tweet down in the image, he actually asked that it be re-

 7    Tweeted again, Jack Flynn, the last thing.

 8                THE COURT:  Sorry, the one on page 13?

 9                MS. BOLGER:   So page 13, the last Tweet in the

10    story --

11                THE COURT:  Oh, I see, yes.

12                MS. BOLGER:   -- it says, "Joe, can you repost the

13    oath we took on the Fourth?"

14                THE COURT:  Got it.  Okay.  Thank you.

15                MS. BOLGER:   So from this fleeting appearance,

16    the plaintiff has concocted a defamation claim in which he

17    says CNN accused him of being a racist, an extremist, an

18    anti-Semite and a bunch of other things.  But the Court

19    should dismiss the complaint because the CNN report doesn't

20    say any such thing.  In fact, the only thing the report

21    actually says about the Flynns is that they were standing

22    next to their brother Michael.  And even if your Honor

23    construes the report as containing some kind of defamatory

24    meaning that the Flynns are associated with QAnon, well,

25    your Honor, the plaintiffs' own complaint establishes that
```

PROCEEDINGS                                7

1

2  they themselves have probably associated themselves with

3  QAnon.

4          THE COURT:  Well, that's "publicly associated

5  with"; is that equal to "follower," which is what the CNN

6  video says?

7          MS. BOLGER:  Well, the CNN video doesn't say

8  that, your Honor.  They --

9          THE COURT:  Well, the chyron says "QAnon

10 follower," and it has their picture on it.  So it's

11 labeling them a QAnon follower.

12         MS. BOLGER:  Well, no, your Honor; what the CNN

13 chyron in that one freeze frame of that one one-and-a-half-

14 second of the larger report says is CNN goes inside a

15 gathering of QAnon followers, so it doesn't actually say

16 they are QAnon followers.  And --

17         THE COURT:  Wait, wait, wait, wait.  How can you

18 say that?

19         MS. BOLGER:  Well, it says they go inside a

20 gathering.  Right?  It doesn't say these are QAnon

21 followers; it just says they go inside a gathering.  I just

22 wanted to make sure I was correctly quoting the sentence.

23         THE COURT:  Yes, but that's a picture.  And right

24 below the picture it says, "QAnon followers."  How is that

25 not calling them QAnon followers?

PROCEEDINGS                          8

1

2           MS. BOLGER:   Well, your Honor, because it's one

3  frame of a full report.  And the law is very clear in Rhode

4  Island and in New York that in assessing defamatory

5  meaning, the Court has to look at what CNN actually

6  distributed, not what the plaintiff chooses to freeze

7  frame, but what CNN actually distributed.  And here, taking

8  the context as a whole, the report is actually not about

9  the plaintiffs at all.  The report actually talks about a

10  QAnon gathering in Arizona, which is, your Honor, why I'm

11  mentioning the word "gathering," because the report is

12  actually about a gathering, a specific gathering, not this

13  one.

14           And in the report, Donie O'Sullivan, who's the CNN

15  commentator, says to the audience that there's this QAnon

16  following, and he shows someone playing the guitar and

17  singing the song, "Where we go one, we go all."  And then

18  he says that that QAnon slogan has been endorsed by Michael

19  Flynn.  And after he says that, they show this quick clip,

20  and then it goes back to talking about Michael Flynn's

21  refusal to disavow QAnon and President Trump's refusal to

22  disavow QAnon.

23           THE COURT:  Right.

24           MS. BOLGER:  That's what the report says.  There

25  is no precedent for simply basing a defamation claim on one

```
 1                          PROCEEDINGS                    9
 2   frame; you have to look at the report as a whole.
 3            THE COURT:  Well, right.  But the report -- I've
 4   watched the video many times, and the report is various
 5   clips of that meeting, and there are pictures of the people
 6   at the meeting.  There are people at -- and then there are
 7   clips of the January 6 riot, and there are other clips of
 8   various people.  And the tone of the whole report is these
 9   people, everybody that we're showing you is a QAnon
10   follower.  So isn't that the context of the whole report,
11   that anybody you're seeing is a QAnon follower?
12            MS. BOLGER:  Well, no, your Honor; you're
13   supposed to look at the words that are actually contained
14   in the report, not the context -- not the way the plaintiff
15   chooses to characterize it.  The report itself discusses
16   only that Michael Flynn said these words and has supported
17   QAnon.  That's the only context that this is used.  There's
18   no connection.  There's none of the connective tissue that
19   your Honor is talking about, you know, implying that these
20   people are engaging in this behavior.  None of that
21   connective tissue is in the report.  It's in the complaint,
22   but it's not in the report, and you should focus on --
23            THE COURT:  But then your whole defense is, well,
24   they are QAnon followers, so it's okay that we called them
25   QAnon followers.  So you're contradicting yourself.
```

|   |   |   |
|---|---|---|
| 1 | PROCEEDINGS | 10 |

```
2          MS. BOLGER:   No, your Honor, we're not

3   contradicting ourselves.  The report doesn't say they're

4   QAnon followers.  The only thing the report says about the

5   plaintiffs is that they were standing next to their brother

6   when he said, "Where we go one, we go all."  That's the

7   only thing the report says.

8          If your Honor chooses to disagree with me and

9   believes that the report associates them with QAnon, then I

10  do think, your Honor, if you were to accept that

11  interpretation, which to be clear, I don't think you

12  should, they are -- they have associated themselves with

13  QAnon in several ways that I can show you in the complaint.

14  Right?  Not only did Mr. Flynn say the -- and Mrs. Flynn

15  say the words, "Where we go one, we go all," and post that

16  video to Twitter, to re-Tweet it to Twitter so that he

17  could get hundreds of thousands more followers, but also

18  throughout the complaint the plaintiff himself selected

19  Tweets that show his affiliation or their association with

20  Q.  And I can just pop through --

21          THE COURT:  Again, you're equating the word

22  "follower" with "association" or "affiliation."  And I'm

23  not sure that that's the right thing.  I'm not sure a juror

24  would equate all three of those verbs as the same thing.

25          MS. BOLGER:   Well, your Honor, in a defamation
```

| 1 | PROCEEDINGS | 11 |

2  case the literal truth is not required.  Right?  It is not

3  the case that your Honor needs to parse "follower" to mean

4  one thing.  Substantial truth is required.  Right?  And in

5  the *Tannerite* case and the *Cabello-Rondon* case what the

6  Second Circuit actually said was that the plaintiff had to

7  plead facts that establish material falsity and substantial

8  truth, which is a squiffer -- that's a legal term --

9  definition than literal truth -- establishes the truth

10  here.  And here, your Honor, it's impossible to suggest

11  that the substantial truth of the QAnon allegation is not

12  established when the plaintiff himself Tweets out -- and

13  it's in the complaints --

14          THE COURT:  Page 13 and 14.

15          MS. BOLGER:   -- at page 15, a giant Q that says,

16  "Where we go one, we go all," and says, "If this means you

17  believe in the Constitution and equal justice under the

18  law, then this works for me."  Your Honor, the substantial

19  truth is that Jack Flynn has willingly chosen to associate

20  himself with QAnon.  There's no question about that.  I can

21  read all of the other ones that are in here or Exhibit 12,

22  my sort of one in Exhibit 12 that I think is so persuasive.

23          THE COURT:  But they also say we're not QAnon

24  followers.  They allege that.  I have to assume that that's

25  true.

1                          PROCEEDINGS                    12

2              MS. BOLGER:   But you don't, your Honor,

3   because --

4              THE COURT:   I do.  Well, it's a motion to dismiss.

5   I have to take it as true that they say they're not QAnon

6   followers.

7              MS. BOLGER:   The *Iqbal* decision itself actually

8   defines "plausibility" in a way that is inconsistent with

9   what Mr. Biss argues in his papers.  The *Iqbal* decision

10  itself actually defines "plausibility" and it says that the

11  Court should assess plausibility by, quote, "drawing on it

12  is judicial experience and common sense."  Right?  That's

13  what *Iqbal* says.  So you are not required to just blindly

14  accept what's in the complaint; you're allowed to draw on

15  your judicial experience and common sense.

16             And more than that, your Honor, there's a case we

17  cited in the brief, the name of which I will get in one

18  second, that says when allegations in a complaint are

19  actually contradicted by other allegations in the

20  complaint, you're not obligated to rely on them.  And here,

21  your Honor, that's what's happening here.  First of all,

22  your Honor, the plaintiff says, well, I just said this

23  because it was a family gathering, and I said it out of

24  support for my family.  Well, the plaintiffs' own complaint

25  contradicts that.  The last several pages of the complaint,

1

2 pages 19 through 23, have Tweet after Tweet after Tweet by

3 other people using the hashtag "take the oath" and

4 associating it with QAnon.  Right?  That contradicts

5 plaintiffs' own allegation that this was just a family

6 thing to say.  The article, in footnote four, The

7 Washington Examiner story, which was written at the time of

8 the original posting, the July 4th video, has a Washington

9 Examiner article which itself says, "This is the QAnon

10 oath.  Take the oath of the QAnon movement."  Everything

11 the plaintiffs are saying is contradicted by their very own

12 exhibits.  And under those circumstances, your Honor,

13 you're not required to take the plaintiffs' representation

14 as truthful.

15         THE COURT:  So this case is a little bit unusual

16 in that, as you say, CNN doesn't state the words, "The

17 Flynns are QAnon followers," but there's their picture and

18 then there's the chyron below it.  What's the closest case

19 here, from your perspective, as that not being a statement?

20 So what's your strongest case for me to believe that CNN

21 did not state that the Flynns were QAnon followers based on

22 the chyron and their image?

23         MS. BOLGER:   I think, your Honor, the closest

24 cases are the -- the *Marcil* case, which is actually a Rhode

25 Island Court of Appeals case.

```
 1                          PROCEEDINGS                    14

 2              THE COURT:  Yes.

 3              MS. BOLGER:   In the Marcil case what the Court

 4    says is you're not supposed to add innuendo or any kind --

 5    you're not supposed to introduce new matter or enlarge the

 6    meaning of words to give to language a construction it will

 7    not bear.  What the plaintiff is saying is that you have to

 8    ignore the evidence of what the report actually says and

 9    impose this idea that they're QAnon followers.  I don't

10    think, your Honor, that it has that meaning.

11              There are all kinds -- the Bray case in Rhode

12    Island is a case that says you have to construe this broadly.

13    The Mann v. Evel case, which is a New York Court of Appeals

14    case, which we didn't cite because at the moment we're

15    agreeing Rhode Island law applies, says that you have to

16    construe the subheadline in connection with the much larger

17    argument.  And there's case after case in New York, which

18    just frankly has more defamation law than Rhode Island because

19    we have more --

20              THE COURT:  Yes, I've noticed.

21              MS. BOLGER:   -- organizations.  Right?  So there is

22    the -- in this court there was the Cummings case that was just

23    decided.  In this court there was the BY case that was just

24    decided.  These are all cases where what the court says is you

25    can't just base it on one thing; you have to take a step back
```

1                                    PROCEEDINGS                         15

2   and look at the report.  So that's the line of cases, your

3   Honor, that I think give us the strongest support for the fact

4   that it doesn't convey the [indiscernible].

5           THE COURT:  Okay.  Let's talk about the limited-

6   purpose public figure versus private figure.  So you allege

7   that Jack Flynn is a limited-purpose public figure, at

8   least, if not a public figure.  How does just having a

9   famous brother and Tweeting get you out of being a private

10  person?

11          MS. BOLGER:  So it wouldn't, your Honor, and I

12  didn't argue that it does.

13          THE COURT:  Okay.

14          MS. BOLGER:  So the regime for establishing a

15  limited-purpose public figure, which was actually created

16  in *Gertz v. Robert Welch*, is the idea that a person becomes

17  a public figure by stepping into a preexisting controversy

18  and seeking to influence its outcome.  That's the Gertz

19  test, and there's a Rhode Island case we cited in the

20  [indiscernible].

21          Your Honor, here there was, of course, a

22  preexisting public controversy regarding QAnon and,

23  frankly, Michael Flynn himself.  Jack Flynn stepped into

24  that controversy by doing a couple of things.  One is you

25  can tell from many of the Tweets he was an aggressive

supporter of his brother and his brother's dismissal -- the

dismissal of the charges against his brother.  He also was

an aggressive promoter of the video of him saying, "Where

we go one, we go all."  That's at page 13 of the complaint,

your Honor.  That's where he asks to repost the oath

video -- that's what he calls it, "the oath video."  In

addition, he's an aggressive seeker of eyeballs.  Right?

He goes from 100,000 Tweets to more than 200,000 Tweets in

one day by promoting his "Where we go one, we go all,"

video.  And we cited cases in our brief, your Honor, where

increasing -- making publications that increase your

Twitter promotion actually make you into a public figure.

Those are in our brief.

        THE COURT:  But his -- the number of his followers

is not in the complaint, though, right?

        MS. BOLGER:   No, your Honor, but you can take

judicial notice of it.

        THE COURT:  Okay.

        MS. BOLGER:   I mean, he relies heavily on his

Twitter feed.  It's integral to his complaint and --

        THE COURT:  He relies on these Tweets.  He doesn't

rely on his whole feed.

        MS. BOLGER:   Well, but in the -- first of all, I

think under the *Chambers* case, which is a Second Circuit

| | PROCEEDINGS | 17 |

1

2 case, the Court would say that anything that he relies on

3 in the complaint becomes part of the complaint.  And --

4           THE COURT:  Right.  Which is --

5           MS. BOLGER:   And there's Judge Abrams'

6 [indiscernible] a fantastic Judge Abrams' case, which

7 begins with a G -- hold on one second -- sorry.  And in

8 that case Judge Abrams actually takes judicial notice of

9 Tweets other than the ones that are actually put into the

10 complaint by the plaintiff because those Tweets are

11 integral to the complaint and because the plaintiff can't

12 be allowed to say some things are in it but some things are

13 not.  So there is actual precedent for relying on those

14 Tweets.

15           THE COURT:  Okay.  All right, so then let's talk

16 about Mrs. Flynn.  So, clearly, she's a private figure;

17 there's no dispute about that.

18           MS. BOLGER:   Not at the moment, your Honor.

19           THE COURT:  How hasn't she at least alleged

20 negligence -- we're just talking about Rule 8 here, and

21 there are several obligations, paragraph 20,

22 paragraph 23(c), where she alleges, for example, CNN could

23 have called the Flynns or taken other steps to confirm?

24           MS. BOLGER:   Because none of those actually would

25 constitute negligence.  So, first of all, your Honor, her

primary argument that there is -- that the defendant acted

with negligence is two-fold.  Her primary argument is if

they had looked at my Twitter feed, they would have known I

wasn't as QAnon supporter.  And her secondary argument is

they're a wing of the Democratic party, and they act with

bias.

I'll take those in reverse order.  The bias

argument, of course, has been rejected by every single

Court that's ever heard it, most recently, in the *Arapaho*

case in DDC and the *Dershowitz* case in the Southern

District of Florida.

As to the first part, that they already went back

and looked at her Twitter feed and would have known that

she wasn't a QAnon supporter, well, that's completely

undercut by Exhibit 13 in which she Tweets and re-Tweets

QAnon slogans.  Right?  So, in fact, had CNN gone back and

looked at Ms. Flynn's Twitter feed, it would have confirmed

the truth of the allegedly defamatory implication that

plaintiff seeks to graft onto this one report.

THE COURT:  Right.  I thought that bias -- you

know, certainly bias or a failure to investigate is not

enough for actual malice.  But for negligence, you're

saying that bias isn't enough for negligence?

MS. BOLGER:   Bias is not enough for negligence.

|     |     |     |
| --- | --- | --- |
| 1   | PROCEEDINGS | 19 |

```
 2              THE COURT:  Okay.

 3              MS. BOLGER:   Negligence is a departure from a

 4    standard of care.  A standard of care is not

 5    [indiscernible] bias -- objective standard of care.

 6              THE COURT:  Okay.  I'm sorry.  I keep interrupting

 7    you.  Go ahead.

 8              MS. BOLGER:   That was going to be it on the

 9    negligence issue --

10              THE COURT:  Okay.  Yes.

11              MS. BOLGER:   I think the only other claim to

12    discuss is the false -- oh, your Honor, there is the fact

13    that the plaintiff didn't technically comply with the Rhode

14    Island pleading requirements for defamation per se, and

15    then the requisite special damages.  That is a quirk of

16    Rhode Island law.  If it was a New York law, I probably

17    wouldn't be making the argument, your Honor.  But the

18    allegations in the complaint of this sort of nebulous bad

19    acting is insufficient to --

20              THE COURT:  Hold on one second.  Hold on one

21    second.  Okay, just hold on one second.  We're going to

22    have to fix the recording.  So if you can just bear with

23    us, and then I'll have you repeat the last thing that you

24    just said.

25              It's going now.  Okay.  So you were talking about
```

2  special damages.

3          MS. BOLGER:   Yes.  So, your Honor, the

4  requirements of the Rhode Island law are that you have to

5  plead defamation per se, which is to say defamation which

6  harms you in your business.  And if you don't plead

7  defamation per se, you have to plead special damages.  Here

8  there's no allegations in the complaint that the

9  particularly alleged defamatory meaning that the plaintiff

10  seeks to ascribe to the CNN report damaged the plaintiffs

11  in their business.  It's unclear how it could damage your

12  business as a seafood salesman in Rhode Island or as a

13  homemaker and hairdresser.  And more than that, there's

14  insufficient allegations of special damages.  The law is

15  very clear that special damages need to be enumerated

16  financial harm.  There are no enumerated financial harms in

17  the complaint; they're just not there.

18          Soi even if, your Honor, you disagreed with on

19  everything else, fundamentally, he has not pled the claim

20  of defamation per se with special damages.

21          THE COURT:  Okay.  Great.

22          MS. BOLGER:   And the last thing, your Honor, is

23  there is an intentional -- there's an invasion of

24  privacy/false light claim.  False light, actually, of

25  course, doesn't exist in New York.  But it is true in the

|    | PROCEEDINGS                                                    21 |
|----|------------------------------------------------------------------|
|  1 |                           PROCEEDINGS                      21    |
|  2 | rest of the world that false light exists.  But false light     |
|  3 | is bounded by the same things as the tort of defamation:        |
|  4 | substantial truth and actual malice.  And the failure to        |
|  5 | plead either of those dooms your false light claim.  So,        |
|  6 | your Honor, here we believe the claim should be dismissed.      |
|  7 |           THE COURT:  Okay.  Thank you.                          |
|  8 |           All right, Mr. Biss, the floor is yours.              |
|  9 |           MR. BISS:  Judge, good morning.                       |
| 10 |           THE COURT:  Good morning.                             |
| 11 |           MR. BISS:  May it please the Court, I'm Steve         |
| 12 | Biss, and I represent the Flynns.                               |
| 13 |           Judge, I'm going to respond to the Court's           |
| 14 | questions and Ms. Bolger's responses.  Of course, I'd be       |
| 15 | happy to answer any other questions.  We have, as the Court    |
| 16 | knows, both parties filed detailed briefings.                  |
| 17 |           THE COURT:  Yes.                                       |
| 18 |           MR. BISS:  With regard to the -- I'll start in the   |
| 19 | reverse order; I'll start with the issue of damages.  So       |
| 20 | Jack Flynn is a businessman.  And the complaint clearly        |
| 21 | alleges that the statements affect him or impute to him an     |
| 22 | unfitness to perform his duties and responsibilities as an     |
| 23 | executive of a seafood company or -- it doesn't matter,        |
| 24 | seafood company or any other company, it doesn't matter.       |
| 25 | He's a businessman.  And with great respect to my             |

```
                              PROCEEDINGS                      21
 1
 2   rest of the world that false light exists.  But false light
 3   is bounded by the same things as the tort of defamation:
 4   substantial truth and actual malice.  And the failure to
 5   plead either of those dooms your false light claim.  So,
 6   your Honor, here we believe the claim should be dismissed.
 7             THE COURT:  Okay.  Thank you.
 8             All right, Mr. Biss, the floor is yours.
 9             MR. BISS:  Judge, good morning.
10             THE COURT:  Good morning.
11             MR. BISS:  May it please the Court, I'm Steve
12   Biss, and I represent the Flynns.
13             Judge, I'm going to respond to the Court's
14   questions and Ms. Bolger's responses.  Of course, I'd be
15   happy to answer any other questions.  We have, as the Court
16   knows, both parties filed detailed briefings.
17             THE COURT:  Yes.
18             MR. BISS:  With regard to the -- I'll start in the
19   reverse order; I'll start with the issue of damages.  So
20   Jack Flynn is a businessman.  And the complaint clearly
21   alleges that the statements affect him or impute to him an
22   unfitness to perform his duties and responsibilities as an
23   executive of a seafood company or -- it doesn't matter,
24   seafood company or any other company, it doesn't matter.
25   He's a businessman.  And with great respect to my
```

| 1 | PROCEEDINGS | 22 |

2  colleague, I would suggest to the Court that it is obvious

3  if somebody gets labeled as being a follower of an

4  extremist group, that's going to impact their ability

5  to function an executive of a company.  There are

6  plenty of examples of executives being fired simply

7  because they went to the January 6th or they

8  participated in going to the Capitol on January 6th,

9  plenty of examples.  So that's with regard to Jack Smith

10  *[sic]*.

11       With regard to Mrs. Flynn -- Jack Flynn -- with

12  regard to Mrs. Flynn, who is clearly a private figure, the

13  *Gertz* case controls.  *Gertz* is the case.  In *Gertz* -- I

14  would just commend the *Gertz* case to the Court.  You've

15  probably read the *Gertz* case.

16       THE COURT:  Yes, I have.

17       MR. BISS:  It talks about what's required to

18  prove in a private-figure case or a private-individual

19  case.  And special damages is not limited, as my colleague

20  pointed out, is not limited to financial harm; it includes

21  mental anguish, it includes insult, injury, humiliation,

22  embarrassment. The Rhode Island Supreme Court has adopted

23  that *Gertz* definition of actual injury, and that's what

24  controls here.  And Mrs. Flynn has clearly alleged that

25  she suffered actual injury as a result of the publication.

2  And I would add this one fact.  Shortly after this episode

3  aired, she gets a text from her girlfriend, her next-door

4  neighbor, that says that we saw you on CNN.  And we allege

5  in the complaint that the publication of these facts have

6  caused both Flynns -- have caused actual injury to both

7  Flynns.  So under *Gertz* we've satisfied the pleading

8  standard for special damages because special damages are

9  not simply limited to financial harm.  A homemaker, if you

10 believe that a homemaker can't suffer harm by being accused

11 of being a neo-Nazi or any other false or defamatory

12 concept, I take great exception to that comment.  Just

13 because she's working at home doesn't mean that her

14 reputation can't be soiled and wrecked by falsely

15 attributing to her an affiliation that she doesn't have.

16 So I would submit to your Honor we have satisfied the *Gertz*

17 pleading standard for actual injury for Mrs. Flynn, and we

18 have pled defamation per se for the reasons stated in our

19 brief.  And we cite a number of cases in our brief -- I

20 won't go into those.

21           With regard to --

22           THE COURT:  And I just pause you there for one

23 second?  Because --

24           MR. BISS:  Yes, your Honor.

25           THE COURT:  -- I think this question does relate

1                              PROCEEDINGS                    24

2   to damages.  So in paragraph 19, I think it is, the Flynns

3   allege that they received threats, I believe it was.  I

4   assume that's part of your allegation of damages.  Is there

5   anything you can elaborate -- I think it's 19(d).  Sorry.

6              MR. BISS:  Sure.  It is, Judge, it's by almost

7   definition one of the classic ways that you can prove

8   actual injury.  So injury to reputation is measured by the

9   value of your reputation before the publication measured by

10  the value of your reputation after.  So what you have to

11  look at is the impact of the defamatory statements on your

12  reputation.  The fact of the matter is the Flynns got death

13  threats, the Flynns got threats of bodily harm as a result

14  of being falsely affiliated with QAnon or being QAnon

15  followers.  That's actual injury.  That's injury to your

16  reputation, that's injury to your name.  And so the Court's

17  correct to point that out, that we do allege here that

18  there are facts in the complaint that show that they did

19  suffer a tangible injury.  For instance -- and this happens

20  a lot with these nationwide publications.  There are -- and

21  I say this with great respect -- there are a lot of crazy

22  people out there in the world.  And part of the danger here

23  of associating somebody with QAnon or associating them with

24  neo-Nazis or other similar things, Judge, is that somebody

25  shows up on your front step.  These phone calls and these

1

2   voicemails are devastating to people.

3          THE COURT:  So they received -- did people show up

4   at their house --

5          MR. BISS:  No.  Nobody showed up at their house.

6   That --

7          THE COURT:  -- actually?  Did they receive --

8          MR. BISS:  -- was just an analogy.  But they did

9   receive death threats, they did receive phone calls.  And

10  we allege that in the complaint because this is what causes

11  them enormous emotional and psychological injury is to have

12  them threatened and then -- because you don't know what's

13  going to happen next.

14         THE COURT:  Right.

15         MR. BISS:  If you're a public figure -- and I

16  represent certain public figures -- if you're a public

17  figure, you have the protection of the capitol police.  Or

18  if you're a member of the court, you have the protection of

19  the federal police.  The Flynns don't have any protection.

20  So this was devastating to them.  And those are facts that

21  support the allegation of damages in this case.

22         THE COURT:  Okay.  So they received phone calls.

23  Did they receive text messages or anything in the mail or

24  anything else that would be additional facts supporting

25  these threats, as opposed to just the simple assertion that

1                          PROCEEDINGS                    26

2   there were threats?  Is there anything else you can tell

3   the Court about specifics on those?

4          MR. BISS:  I can't without getting into the

5   specific evidence, without producing in discovery the

6   voicemails and those types of things, I can't -- I

7   haven't --

8          THE COURT:  Categorically were there -- what form

9   did the threats come in?  You said phone calls.  Were there

10  also text messages or anything in the mail or anything in

11  person --

12         MR. BISS:  Judge, I can't represent to you that

13  there were text messages or mailings.  I can only tell you

14  that there were telephone calls.

15         THE COURT:  Okay.  Thank you.

16         MR. BISS:  And I would just -- just to circle back

17  on that, to come full circle, I think that's enough.  I

18  don't think I have to -- I mean, I don't think -- there's

19  no case I know of and no rule I know of that says that in

20  order to be able to allege damages, you had to have gotten

21  voicemails plus text messages --

22         THE COURT:  I wasn't suggesting that there was.  I

23  was just trying to find out -- you said -- the complaint

24  says threats; I was trying to find out how they arrived.

25  That's all.

```
 1                        PROCEEDINGS                     27
 2             MR. BISS:  Yes, your Honor.
 3             On the issue of negligence, again, I disagree with
 4   my colleague.  The fact of the matter is it would have been
 5   pretty simple to pick up the phone -- and this is what they
 6   always do -- they pick up the phone -- they've already
 7   written their article, they pick up the phone, they call
 8   the Flynns, and they say, Do you have any comment?  We're
 9   going to publish the article in two hours or we're going to
10   public the broadcast, the segment in two hours.  The fact
11   is they didn't call.  And that is negligence per se.  For a
12   reporter not to contact the source of an article or the
13   source of a broadcast, that's enough to -- that fact alone.
14             The other thing is -- and I think your Honor
15   pointed this out -- there was no effort to investigate
16   other than apparently Jack Flynn re-Tweeted the video --
17   and I'll get to that in a moment -- no effort to
18   investigate whether or not the Flynns were QAnon followers.
19             So for Mrs. Flynn, there's no question that the
20   negligent standard has been satisfied.  And for Jack Flynn
21   there's no question, based on those facts alone, there's no
22   question that the negligent standard, which is a very low
23   bar, the negligent standard -- it's normally -- it's not my
24   experience to have that particular aspect of the claim
25   challenged.  But I will say in this case the fact that they
```

```
 1                          PROCEEDINGS                    28

 2   didn't call the Flynns is enough to show that they were

 3   negligent.

 4            Jack Flynn, it's alleged that he is a limited-

 5   purpose public figure.  We disagree with that.  He's a

 6   private individual.  We allege that he's a private

 7   individual.  Of course, it's the defendant's burden of

 8   proof to show that he's something other than a private

 9   individual.  Ms. Bolger acknowledged, I think she confirmed

10   to the Court, that simply Tweeting and being the famous

11   brother of a -- having a famous brother is not sufficient.

12   But she really didn't add anything more to that.  She

13   suggested that he was an aggressive supporter of his

14   brother.  Of course, I mean, the Flynn family aggressively

15   support each other.  They are a very tight family.  They're

16   a large family.  But loving your brother or aggressively

17   supporting your brother in an extremely difficult long-term

18   prosecution does not make you a public figure.  I don't

19   know of any case that would show that.

20            She also said that he re-Tweeted the video.

21   Judge, that doesn't make you a public figure.  That would

22   make everybody a public figure.  Everybody who ever

23   repeated that, re-Tweeted that video, would make them a

24   public figure.  That does not make Jack Flynn a public

25   figure.
```

```
 1                          PROCEEDINGS                 29

 2             And then the other thing she said was that he

 3   promoted the video.  And I think what she's referring to is

 4   where he says to his brother Joe -- and it's in the

 5   complaint -- go ahead and re-Tweet it or reshare it.

 6             THE COURT:  Right.

 7             MR. BISS:  Judge, that gets me -- I just want to

 8   address that for a moment.  That's back in July of 2020.

 9   Okay?  That has nothing to do with QAnon.  When Jack Flynn

10   says re-Tweet the video, it has nothing to do with QAnon.

11   Ms. Bolger's taking Jack Flynn's re-Tweet in 2020

12   completely out of context to this case.  It has nothing to

13   do with being a QAnon follower.  He's not saying, "I'm a

14   QAnon follower.  Re-Tweet this."  He's just re-Tweeting

15   because it is -- it supports his brother Mike.  And that's

16   what we allege in the complaint.  And there's nothing more

17   alleged here.  Being an aggressive supporter of your

18   brother, re-Tweeting something that you believe would help

19   your brother, and telling your other brother to share it

20   with somebody, I would respectfully submit doesn't make you

21   a limited-purpose public figure, at least given the

22   backdrop of where we are today in the proceedings.  Okay?

23   Where we are today is the 12(b)(6) stage.  Of course, the

24   defendant has the burden of proof, and they might -- in

25   discovery they might discover that Jack Flynn has done
```

1

2  more.  I doubt they will, but they may.  Or they might

3  find, as I've had in other cases, that he did less.  We

4  don't know.  You don't know what it is.  But on these facts

5  and at this stage of the proceeding, there is -- given that

6  the Flynns have alleged that they are private individuals

7  specifically, that part of the motion should be denied.

8  And, obviously, they can revisit it on summary judgment if

9  they develop any facts.

10             THE COURT:  Can I just pause you for a second?  So

11 in the complaint there are a couple of places that

12 reference -- obviously, there are Tweets that are

13 screenshotted and included in the complaint, but there are

14 several places where the complaint references the Flynns'

15 Twitter account or their Twitter feed generally.  And they

16 say if CNN had just looked at their Twitter feed, they

17 would have seen that they were not QAnon followers.  Why

18 don't that open the door to me looking at everything that

19 Ms. Bolger handed up to me and the rest of their archived

20 Twitter feeds?

21             MR. BISS:  Well, again, Judge, I think their --

22 she goes much further than Jack Flynn's Twitter feed.  And

23 with regard to Leslie Flynn, what they have attached as an

24 exhibit is one Tweet that could not possibly be

25 construed -- I couldn't even read it -- couldn't possibly

```
 1                        PROCEEDINGS                    31
 2  be construed as being evidence that you're a QAnon
 3  follower.
 4           THE COURT:  Right.  I'm just asking in terms of
 5  considering for purposes of the motion to dismiss my being
 6  able to at least look at those additional Tweets that the
 7  defendants have submitted.
 8           MR. BISS:  Judge, I disagree with Ms. Bolger.  I
 9  don't think that it opens the door to have you review every
10  single Tweet that Jack Flynn ever published.
11           THE COURT:  Okay.  But what about at a minimum the
12  additional ones that Ms. Bolger has given me?
13           MR. BISS:  Well, again, I mean, again, I think the
14  Court is limited to what's in the complaint.  And I don't
15  believe that -- and you'll note in our opposition we
16  footnoted in several places that we believe they went way
17  past the four corners of the complaint.  So, again, that's
18  our position with regard to the proffer of additional
19  information by her.  I don't think it alters or changes the
20  needle -- whatever that metaphor is with regard to the
21  stage of the proceeding that we're at.  But even if the
22  Court does consider it at this stage of the proceeding, it
23  doesn't change the nature of it.
24           THE COURT:  So I was pushing Ms. Bolger on the
25  substantial truth point and I was suggesting that she was
```

```
 1                           PROCEEDINGS                    32
 2    conflating follower with association with affiliation.
 3    And, you know, I'm really wrestling with that on this
 4    motion and the posture that I'm in in which the Rhode
 5    Island cases say that defamation is a question for the
 6    Court but at the same time we're at the motion-to-dismiss
 7    stage and it's just the sufficiency of the pleading.  So
 8    what can you tell me about -- even if I look at these
 9    Tweets, these other Tweets that CNN has pointed me to, how
10    do I decide at this stage who is a follower or who is not a
11    follower?
12             MR. BISS:  Judge, I think the Court hit it right
13    on the head.  This broadcaster or segment, this special
14    report, clearly identifies in a sort of a staccato multiple
15    individuals who they all say are QAnon followers.  And
16    included in that snapshot are Jack and Leslie Flynn.  And
17    the Court has to look at the context in which it was
18    published.  This article was published February 4 -- I say
19    "article" -- this broadcast, this segment -- if I keep
20    saying article, it's only because I'm used to that.
21             THE COURT:  That's okay.  I understand what you
22    mean.
23             MR. BISS:  This publication was published on
24    February 4, 2021, within a month of the storming of the
25    Capitol.  And I think, Judge, this whole idea about QAnon
```

 1
 2   being a violent extremist group, we didn't have that back
 3   in 2020.  So the context of when this publication occurred
 4   is important because clearly Jack Flynn, when he re-Tweeted
 5   in 2020, there was no mention of QAnon being a violent
 6   extremist group.  The FBI had not labeled them, the
 7   Department of Homeland Security had not labeled them.
 8   Other things we point to in the complaint are Congress --
 9   Congress passed a piece of legislation in October -- it's
10   in a footnote, Judge, in the complaint.
11            THE COURT:  Yes.  I was actually thinking about
12   the FBI report or the FBI designation.  Do you know when
13   that occurred?
14            MR. BISS:  I don't, Judge.  I don't know when that
15   was, but I can find that out for your Honor.  But it -- as
16   the election loomed and as the election passed and the
17   post-election events occurred, there became a sort of a
18   fixation on this QAnon.  And the FBI and Department of
19   Homeland Security clearly labeled them as domestic
20   terrorists.  Now, that's a -- you don't want to be -- no
21   one wants to be associated with that.  And I would suggest
22   to your Honor that I think Ms. Bolger said common sense and
23   use the idea of common sense.  And the Court doesn't -- of
24   course, nobody -- courts, juries, don't ever give that up
25   at the door.  But if you think about using the Court's

1                              PROCEEDINGS                    34

2    common sense, if you were affiliated with a violent

3    extremist group, Judge, that would be defamatory per se

4    about the Court, about anybody, defamatory per se.  The

5    best case -- and it's an unfortunate case because it had

6    to -- it went through an appeal in the Sixth Circuit.  We

7    cite it.  It's *Boulger v. Woods* -- and that's B-o-u-l-g-e-

8    r -- *versus Woods*.  And James Woods, the actor who was

9    active on Twitter till he got banned, published a

10   statement -- I'll say it's a statement, and I'll tell you

11   why the Sixth Circuit said it wasn't a statement.  And the

12   statement was that is Ms. Boulger, is that Ms. Boulger

13   giving the Nazi salute.  And he put a picture of what was

14   putatively Ms. Boulger in the Tweet.  It turned out it

15   wasn't Ms. Boulger; it was somebody else.  But Ms. Boulger

16   was at a Trump rally, and she's a Democratic operative, and

17   the Sixth Circuit Court of Appeals said that by simply

18   associating her with somebody who would give the Nazi

19   salute, that is capable of a defamatory meaning.  And the

20   case was eventually reversed by the Sixth Circuit because

21   they found that, whether you agree with this or not, they

22   found that Mr. Woods was not -- he didn't make a statement,

23   he asked a question.  And it would seem to me that's -- you

24   know, again, whether we agree with that or don't agree with

25   that, that's a different issue.  But that case clearly

```
 1
 2   demonstrates that when you falsely associate somebody with
 3   an extremist group, there's no question it's capable of a
 4   defamatory meaning.  We cite other cases in the brief, as
 5   well.  And we allege material falsity throughout the brief.
 6   I mean, if the Court wants -- I think we cited it enough in
 7   our brief.  And it's clearly materially false under the
 8   Masson standard, under the *Masson v. New Yorker* standard
 9   because they were not followers, they were never followers,
10   and it's all alleged.
11           THE COURT:  Can you talk a little bit more about
12   the actual, how you believe you've sufficiently alleged
13   actual malice?  If CNN is right that Mr. Flynn is in fact
14   at least a limited-purpose public figure and therefore
15   needs to show actual malice, how have you alleged that?
16           MR. BISS:  Judge, I think there's three ways that,
17   three factual ways that we allege actual malice.  And I
18   believe this is -- these are all stated in paragraph 23 of
19   the complaint -- but I'll highlight three because I think
20   that each one of these independently provide a sufficient
21   plausible basis to support a finding of actual malice at
22   this stage.
23           And the one thing I have to say to the Court in
24   these defamation cases is when the cases proceed past
25   12(b)(6), you get to discover all sorts of other things,
```

1

2  you learn all sorts of things about how the reporters went

3  about gathering their evidence and these types of things.

4  And so the landscape changes dramatically when you go to

5  discovery.  There's things you don't know that they did,

6  things you don't know that a source told them.  You don't

7  know if they had any sources.  So they could tell you in

8  the article or in the broadcast they got a source that says

9  X.  And sometimes it turns out they have no sources; they

10  just make it up.

11       So in paragraph 23(a) we allege that they made it

12  up.  They made up that Jack Flynn and Leslie Flynn are

13  QAnon followers.  They just fabricated it; they made it up.

14  And we say that the way they made it up -- the way they

15  knew it was false is because they reviewed Jack Flynn's

16  Tweets.  And if they reviewed his Tweets, they would have

17  saw that he was not a QAnon follower at all.  And we give

18  the Court multiple examples to show how the -- how a

19  reasonable jury could conclude that he wasn't a follower at

20  all.

21       Now, the one that Ms. Bolger sort of highlighted

22  to the Court is on page 15 of the complaint, the amended

23  complaint.  And this is the Tweet where Jack Flynn is

24  actually -- and I do have to concede, Judge, I don't use

25  Twitter.  So --

```
 1                        PROCEEDINGS                    37

 2            THE COURT:  I don't, either.

 3            MR. BISS:  -- if I've got my terms all wrong, I

 4  just want to be clear.  I don't use Twitter because I'm

 5  often involved in litigation with them.  So this is the one

 6  where he either re-Tweets or attaches somebody else's Tweet

 7  from "Escape the Matrix," whatever that is, whoever that

 8  is.  Jack Flynn writes -- and this is all Jack Flynn -- and

 9  you'll see, just to reiterate another issue about

10  supporting your brother -- of course, Jack Flynn's profile

11  picture is a picture of General Flynn, and Jack Flynn

12  repeatedly changed his profile message:  "Jack Flynn, we

13  fight back."  He had all sorts of different hashtags, all

14  of which were intended by Jack Flynn to support his

15  brother.  And he writes, quote, "If this means you believe

16  in the Constitution and equal justice under the law, then

17  this works for me."  And it has attached to it a re-Tweet

18  from "Escape the Matrix" with a big letter Q on it.  That's

19  far from being a QAnon follower.  That's -- the jury could

20  look at that and say what this guy actually means here is

21  that if you support -- if QAnon supports the Constitution

22  and equal justice under the laws of America, then they're

23  not a violent extremist group, they're not dangerous.  But

24  Jack Flynn -- this could not be construed as being somebody

25  who follows the QAnon movement.  In fact, it begins with an
```

```
 1                        PROCEEDINGS                    38
 2  "if."  It begins with a question:  "If this means."
 3             So I would just suggest to your Honor that there
 4  is, number one is the allegation -- number one allegation
 5  on actual malice is that CNN, based on its review of Jack
 6  Flynn's Tweets, fabricated the claim that he was QAnon
 7  follower.  And the reason that you want to bring the Flynns
 8  in in February of 2021 is because Michael Flynn is probably
 9  one of the most prominent supporters of Donald Trump and
10  the Republican party.  That's why -- why would they include
11  the Flynns in this particular segment?  Because they
12  wanted -- they wanted to extend the -- they wanted to
13  sensationalize the news and extend the reach of this.  Not
14  the Flynns, but CNN wanted to get more mileage out of
15  General Flynn than this little barbecue video was intended
16  for.  So number one is the fabrication.
17             Number two, Judge -- and this is in 23(b) -- and
18  23(a) is a long -- there's other things we allege in 23(a).
19  They disregarded the Tweets of Sydney Powell, just
20  intentionally disregarded them as to the meaning of the
21  General Flynn video.  Paragraph 23(b), in 23(b) we allege
22  that they deliberately altered the General Flynn video, and
23  we allege that they did it in such a way that they took out
24  the oath to America, the oath to the Constitution that the
25  Flynns took.  And they also took out the "God Bless
```

 1

 2  America."  And they left it with, "Where we go one, we go

 3  all."  So what we allege in the complaint -- and this is

 4  also pointed out in our briefing papers -- the they created

 5  a false insinuation that the Flynns were pledging an oath

 6  of allegiance to QAnon.  By omitting the words, "God Bless

 7  America," the oath to the Constitution, they created a

 8  false impression in the minds of readers that the Flynns

 9  had pledged an oath of allegiance to QAnon and were

10  therefor QAnon followers.  That's the second factual basis

11  for actual malice is their alteration of the record.

12          Number three is -- and this is in paragraph 23(c)

13  of the complaint -- and we allege that in the wake of the

14  storming of the Capitol, the accusation that the Flynns

15  were QAnon followers -- because remember that the context

16  of this particular publication is within a month of the

17  storming of the Capitol, CNN is in the midst of a

18  multiple -- I was thinking multi-city tour of QAnon, but on

19  January 31, Anderson Cooper publishes a massive QAnon

20  conspiracy segment, they come out with another segment

21  February 26, so they're in the process of publishing

22  statements linking QAnon to the insurrectionists, the mob

23  that stormed the Capitol.  And so the third factual basis

24  for our claim of actual malice is that CNN knew the

25  publication would cause a media frenzy, and they

1

2 deliberately and recklessly conveyed the false narrative

3 about the plaintiffs to sensationalize the news.  Those are

4 the exact same allegations in the *Tomlin* case that we cite.

5 Obviously, it's not binding on your Honor; it's as Fourth

6 Circuit case, but in that case the television station

7 deliberately and recklessly published false statements in

8 order to create a sensational story.  And those allegations

9 were sufficient for the Fourth Circuit to find that there

10 was an issue of fact on summary judgment.  And that's what

11 they did here.  In the midst of all this controversy that

12 was occurring regarding the storming of the Capitol, the

13 riots, the insurrection, whatever the appropriate word is,

14 because it seems to change a lot, but whatever happened on

15 January 6th.  And I think we can safely say that there were

16 multiple -- there was a storming of the United States

17 Capitol building, there were people who invaded the United

18 States Capitol building.  They called it an insurrection

19 and then I think a couple of weeks ago or a month ago,

20 maybe, Reuters came out and said the FBI changed it, it

21 wasn't an insurrection.

22          THE COURT:  People died.

23          MR. BISS:  People died.  It was a serious, serious

24 breach of national security.  And likely there's going to

25 be some serious -- and people have been arrested, people

 1

 2  have been convicted, people pled guilty, and there's likely

 3  to be much more fallout on those issues.  But this

 4  particular article or publication we allege was published

 5  by CNN in order to sensationalize these issues at a time

 6  when they knew that they could get the most out of these

 7  articles by linking the Flynns to QAnon during this time.

 8  So it's those three pieces, Judge, that we allege support

 9  the claim of actual malice in this case.

10          And actual malice, of course, has -- there's two

11  purposes for actual malice.  Number one is if you find that

12  Jack Flynn is a limited-purpose public figure, we

13  acknowledge that he has to allege actual malice.  And I

14  acknowledge it, but I -- and I've made this argument in

15  repeated cases -- I never expect to win on the argument,

16  but we of course view *New York Times v. Sullivan* as bad

17  law.  I've asked every Court to reconsider it.  And, for

18  the record, I have to ask your Honor to reconsider it.

19          THE COURT:  That's a long shot with me.

20          MR. BISS:  No, I understand.  And I say that with

21  respect to the concept of *stare decisis*.  But I have to

22  preserve that issue.  Some Court's going to consider it.

23  The same arguments were made by Sarah Palin, I think, to

24  Judge Rakoff; and, of course, he denied her motion, as

25  well.  But -- and I want to just say that for the record.

1

2  But the other part of actual malice is for punitive

3  damages.  So we have to -- in order for both Flynns or

4  either Flynn to go to a jury on a claim of punitive

5  damages, they do have to, under *Gertz*, they do have to

6  satisfy or plead actual malice.  And there's other -- in

7  the complaint there's other aspects of actual malice that

8  are talked about in here.

9          And I just want to touch on the bias issue.  So

10 it's a little more complicated than -- and with great

11 respect to Ms. Bolger -- it's a little more complicated

12 than just saying, "Well, bias can never be evidence of

13 actual malice."  Bias, ill will, spite can be evidence of

14 actual malice -- there's the *Duffy* case in the Second

15 Circuit, and there are numerous other cases -- when -- bias

16 and ill will and spite can be evidence of actual malice

17 when the article is published with the intent to inflict

18 harm.  And that's what we allege in the complaint.  So it's

19 not simply that bias has no relevance whatsoever to the

20 actual malice inquiry; it does have relevance.  And I would

21 say this:  The Second Circuit in the *Celle* case, C-e-l-l-e,

22 case said that when a Court looks at actual malice, it's a

23 cumulative process.  Okay?  So the Court doesn't just go,

24 well, there's one factor or two factors; you look at all

25 the factors overall, and if all the factors would plausibly

1
2    lead to the conclusion that the defendant knew the

3    statements were false or acted with reckless disregard for

4    the truth, then they've satisfied the 12(b)(6) standard.

5    And I think, Judge, it is important in this case -- in

6    every case -- although -- to understand -- and what the

7    Second Circuit has said in *LaLiberte* and *Palin*, and that is

8    that the allegations in the plaintiff's complaint have to

9    be accepted as true.  And the reasonable inferences at this

10   stage have to be drawn in favor of allowing the case to go

11   forward to discovery.  And the policies reasons behind

12   that -- we don't often talk about the policy reasons -- but

13   the policy reasons are so that the Second Circuit has a

14   well-developed record.  As I said before, there are things

15   that you learn about even award-winning journalists.  And

16   sometimes you learn things about award-winning journalists

17   and only in discovery.  So --

18           THE COURT:  It's also a risk for the plaintiffs,

19   though, too.

20           MR. BISS:  It's also a risk for the plaintiffs,

21   there's no question about that.  So, I mean, there are

22   enough issues in these cases.  But that's the policy behind

23   the *Iqbal-Twombly* argument is that we want the courts of

24   appeals to have a well-developed record, we want the

25   parties to -- we want to -- not to use 12(b)(6) as a means

```
 1                           PROCEEDINGS                    44

 2   of chilling litigation.  So, again, Judge, we have -- I

 3   think I've addressed all the issues.  I'll be happy to

 4   answer any --

 5               THE COURT:  You have.  Just a couple of factual

 6   points I just wanted to confirm.  So the video -- the clip

 7   that's the basis for the Flynns' claim is just the clip

 8   that's included in the February 3rd Donie O'Sullivan

 9   report?  In other words, the video's not shown in the

10   January 31st Anderson Cooper, it's not shown in the

11   February 26th Anderson Cooper; it's just the February 3rd,

12   right?

13               MR. BISS:  That's correct.  And, Judge, I think

14   it's February 4, but --

15               THE COURT:  February 4.  I've seen it February 3rd

16   and I've seen it February 4th a couple of different places,

17   but --

18               MR. BISS:  You're right.  It's that -- it's what I

19   call the "QAnon followers bit."

20               THE COURT:  Right.  Okay.  And then if I could

21   just ask you to tell me -- you know, we have the --

22   Ms. Bolger handed up to me who is who in the photo from

23   left to right.  Obviously, I recognize General Flynn in the

24   middle, but -- [Stopped talking.]

25               MR. BISS:  Okay, so let's go -- we'll go left to
```

```
 1                        PROCEEDINGS                    45
 2  right?
 3            THE COURT:  Yes, sure.
 4            MR. BISS:  Okay.  So on the far left is Mrs. Joe
 5  Flynn.  And I apologize to the Court; I don't know Joe's
 6  wife's name.
 7            THE COURT:  It's not Jack's wife?
 8            MR. BISS:  No.  Then there's Joe Flynn, General
 9  Flynn, General Flynn's wife, and then my clients are --
10            THE COURT:  Okay, so your clients are on the far
11  right, okay.
12            MR. BISS:  My clients are on the far right.
13            THE COURT:  Great.  Thank you.  Okay.  Thank you,
14  Mr. Biss.
15            MS. BOLGER:   Your Honor, may I --
16            THE COURT:  Yes, please do.
17            MS. BOLGER:   So first of all, your Honor, the two
18  cases whose names I embarrassingly could not remember --
19            THE COURT:  Yes.
20            MS. BOLGER:   -- the first is In Re Yukos Oil,
21  which is a Southern District of New York case from 2006,
22  2006 Westlaw 3026024.
23            THE COURT:  Wait, wait.  A little slower.
24            MS. BOLGER:   Sorry, it's 2006 Westlaw 3026024.
25  And, your Honor, that is the case that says, "This Court
```

```
 1                        PROCEEDINGS                    46

 2   need not accept as true any allegations that are

 3   contradicted by documents deemed to be part of the

 4   complaint or materials amendable to judicial notice."

 5            THE COURT:  Okay.  Thank you.

 6            MS. BOLGER:   Relatedly, your Honor, the case I

 7   talked about in which Judge Abrams recognized Tweets not

 8   included in the complaint is Ganksy v. Menson, 480 F. Supp.

 9   3rd 542, Southern District of New York, from last year.

10   And, your Honor, I do want to mention that if you put those

11   two ideas together, there is no question that you should be

12   taking judicial notice of the Jack Flynn Twitter feed in

13   its entirety because not only does Jack Flynn rely on it by

14   putting it in the complaint, but he actually suggests that

15   somehow defendants magically knew of its entire existence,

16   and that's why they acted with actual malice.

17            THE COURT:  Okay.  Thank you.

18            MS. BOLGER:   I want to talk quickly about

19   substantial truth.  And your Honor I know is viewing this

20   on a 12(b)(6) motion.  First of all, your Honor, as I said,

21   I think you can look at all of these documents on the

22   12(b)(6) motion.  But also, your Honor, the plaintiff is

23   flatly wrong when he tells you I bear any burden on this

24   motion.  And that's what Tannerite and Cabello v. Rondon did

25   in the Second Circuit.  That's different from LaLiberte and
```

1

2  it's different from *Palin*.   What *Tannerite* and *Cabello-Rondon*

3  did was say that the plaintiff at the pleading stage bears

4  the burden of proving facts that provide a plausible basis to

5  believe the defendants engaged in wrongdoing.

6          So, your Honor, it's not just you can throw up some

7  words out there; they have to plausibly plead facts that

8  support the allegations of wrongdoing.  And, your Honor, for

9  all the reasons we say in our papers, including -- and, your

10 Honor, I know that Mr. Biss dismisses it -- this is a giant

11 letter Q with the words, "Where we go one, where we go

12 all," that Jack Flynn chose to re-Tweet on August 21st and

13 posted on his Twitter feed.  And, in addition, on the

14 14th -- I'm sorry -- Exhibit 14 -- 12, Jack Flynn re-

15 Tweeted a Tweet that says, "QAnon is not violent or a

16 conspiracy; we are everyday people seeking truth.  I'm a

17 family man.  I'm educated and run my own business.  I work

18 hard and spend my spare time with my family.  I enjoy golf

19 and reading.  QAnon.  Share and tell your story."  That's

20 something Jack Flynn himself chose to re-Tweet under his

21 own name on Twitter.  If you look at the information posted

22 on Twitter, it confirms that the Flynns will never be able

23 to prove that this story is materially false on the

24 *Tannerite* standard.  *Tannerite* says it has to be the

25 plaintiff that proves facts that are plausible.  These

```
 1                        PROCEEDINGS                      48
 2   Tweets, which are clearly incorporated either in the
 3   complaint itself or by reference, make it impossible for
 4   the Flynns ever, ever to be able to get over that Tannerite
 5   standard.
 6             And I wanted to mention two cases that are in our
 7   briefing.
 8             THE COURT:  Yes.
 9             MS. BOLGER:   One is the Lovejoy case, which is
10   about an affiliation with the Nazis.  And the other is the
11   Bustos case, which is about affiliation with the Aryan
12   Brotherhood.  And, actually, I think the Lovejoy case is
13   helpful.  The Lovejoy case is actually from 1948.  In 1940
14   it was really bad to be called a Nazi, just as in February
15   of 2021, the plaintiff is alleging it was worse to be QAnon
16   than it was when Jack Flynn voluntarily associated himself
17   with it in July.  Right?  What the Lovejoy case says is
18   even if you don't want to be associated with the Nazis now,
19   you yourself said you appreciated the German army and think
20   they treated our troops well.  You associated yourself with
21   the Nazis.  Even if they got worse or even if you don't
22   agree with them now, you stood up to be counted.  And they
23   said that in 1948 -- right? -- the same time difference.
24   So I think Lovejoy is really important here.
25             I don't quite understand the timeliness issue.  If
```

1

2 someone endorses Q in July of 2020, they endorse -- then it

3 is substantially true for all purposes.  You don't --

4 there's no timeliness on the substantial truth requirement.

5 And, your Honor, of course, Jack Flynn disabled his Twitter

6 account, so we don't have anything after January 8th.  But

7 he was Tweeting supportive things for QAnon throughout

8 2020.

9            And I do want to say, your Honor, a couple of

10 things about actual malice and the fact that Jack Flynn

11 actually re-Tweeted this video itself.  First of all,

12 there's no case that I know of that says it's negligent per

13 se not to call for comment.  I don't think that case

14 exists.  But, your Honor, if CNN had looked in the world to

15 see what Jack Flynn and Leslie Flynn said about QAnon, what

16 they would have found was the video Jack Flynn Tweeted

17 himself saying take the oath; they would have found a

18 massive letter Q with the words, "Where we go one, where we

19 go all"; they would have found in Exhibit 12 a picture that

20 he Tweeted out of his brother saying, "The Great

21 Awakening," which is another QAnon slogan.  No amount of

22 diligence or lack of diligence would have changed what CNN

23 said because it would have confirmed the truth of what they

24 published.

25            I'm a little all over the map, so let me talk

1                              PROCEEDINGS                    50

2  briefly about the other arguments he made about actual

3  malice.  The first is he says CNN made it up.  That

4  allegation's obviously not enough to satisfy the *Iqbal*

5  plausibility standard.  You would need facts that support

6  the conclusion that they made it up.

7            In addition, he says they edited the video.  Well,

8  editing a video is actually editorial choice.  That's

9  protected under the First Amendment.  That's a case called

10 *Miami Herald v. Turnillo*.  Plaintiff would have had to have

11 pled facts that supported the allegation that that was done

12 maliciously to be actual malice.  Right?  He would have had

13 to plead some facts.

14           In addition, the idea that he claimed that it was

15 sensationalized, one, he would need facts to support that

16 as in, you know, on this day so-and-so did this thing that

17 made it sensationalized.  And more than that,

18 sensationalizing the news is not evidence of actual malice.

19 That's the *Kipper* case in the New York Court of Appeals.

20           And the last is, your Honor, I didn't say bias

21 could never be calculated in actual malice.  I said

22 political bias cannot be.  And, your Honor, all they allege

23 in the complaint is that CNN are Democrats, so they made

24 this up.  And, your Honor, that is directly rejected in the

25 *Arapaho* case and in the *Dershowitz* case in the Southern

```
 1                        PROCEEDINGS              51
 2   District of Florida.
 3             THE COURT:  Okay.
 4             MS. BOLGER:   Last thing, last topic, I guess, is
 5   the defamation per se and special damages.  Gertz has
 6   nothing to do with special damages.  So what Gertz did was
 7   talk about actual damages.
 8             THE COURT:  Right.
 9             MS. BOLGER:   Actual damages are not special
10   damages under Rhode Island law.  The law is real clear in
11   Rhode Island, and it's not what Mr. Biss just articulated,
12   although he did describe Gertz's actual damages analysis.
13   In Rhode Island defamation per se -- you have to plead
14   defamation per se, which has to have a business injury.  If
15   you don't do that, you must plead actual economic damages.
16   And that's the Sequin case in our brief.  And, your Honor,
17   that's the words, "actual economic damages."  So emotional
18   damages aren't actual damages, and Gertz can't change that.
19   Right?  The Sequin case establishes the Rhode Island
20   special damages requirement that the plaintiff hasn't
21   satisfied.
22             And, your Honor, the discussion of death threats
23   kind of brings to mind what really is the problem here.
24   There's no reason to believe that Mr. Flynn got death
25   threats when CNN published it but not when he published it,
```

| 1 | PROCEEDINGS                                    52 |

2   right?  Jack Flynn published to the world that he said

3   [indiscernible], "Where we go one," and "God Bless

4   America."  He published that to the world.  Those are his

5   words.  CNN didn't even repeat that but showed a clip of

6   that footage.  It's the same thing.  It can't defame him

7   when CNN does it but not defame him when he not only Tweets

8   it but asks for it to be re-Tweeted and consistently re-

9   Tweets Sydney Powell talking about how we should all take

10  the oath.  It's Mr. Flynn's words re-Tweeted over and over

11  because he was promoting that he took the oath.  It is not

12  defamatory when CNN truthfully publishes what Mr. Flynn

13  did.

14          THE COURT:  Can we talk about the *Bustos* case for

15  a second?  I've spent some time looking at that.  You

16  mentioned it earlier.

17          MS. BOLGER:   Yes.

18          THE COURT:  So there, you know, Justice Gorsuch,

19  when he was sitting on the Tenth Circuit, looked at what --

20  similar to this case in some ways, where the inmate, the

21  plaintiff in that case, was shown in a video that was

22  talking about the Aryan Brotherhood, and he alleged, well,

23  I'm not part of the Aryan Brotherhood.  And what Justice

24  Gorsuch focused on was, well, you say that, but you sent

25  them letters and you took heroin from them and you praised

1

2  them, and all those other things.  So those were kind of

3  what Justice Gorsuch was focusing on was specific acts.

4  What I don't see here, aside from Tweeting, which obviously

5  is -- it is an act, but it's more of a statement -- I don't

6  see any -- there's no allegations -- and CNN hasn't pointed

7  to anything, although this may be the sort of thing that

8  will come out in discovery, them going to QAnon meetings or

9  going to rallies or being there on January 6th or anything

10  like that that takes the step farther from just Tweets.

11  And so that to me seemed to be a difference between *Bustos*

12  and this case.  And it was at a different posture, too, I

13  think, but -- [Stopped talking.]

14          MS. BOLGER:  So I actually disagree with your

15  Honor.  So, first of all, it is a different posture.  But

16  there's a reason it's a different posture.  Right?  So it

17  was after summary judgment -- it is a summary judgment.

18  But, your Honor, *Tannerite* didn't exist at the time, and

19  *Tannerite* didn't govern *Bustos*.  Right?  I'm suggesting,

20  your Honor, because it's the law, that *Tannerite* and

21  *Cabello* are different in New York, in the Second Circuit.

22  Right?  We have an explicit requirement that the Second

23  Circuit has been very clear that you must at the pleading

24  stage plausibly allege facts that support the inference.

25  Right?  So *Tannerite* governs --

1
2         THE COURT:  We're in Rhode Island, though.  Does

3  that still govern?

4         MS. BOLGER:   Well, you're not in Rhode Island.

5         THE COURT:  Well, but it's Rhode Island law that

6  we're applying, so do I have to follow what the Second

7  Circuit --

8         MS. BOLGER:   I think you would have to follow

9  Second Circuit on the standard of care required to get over

10  a 12(b)(6) motion, yes, your Honor.

11         THE COURT:  Well, on 12(b)(6), yes.  But on --

12         MS. BOLGER:   That's what *Tannerite* and *Cabello*

13  are about; they're the standard you must show, what you

14  must allege on a 12(b)(6) motion.  That is what *Tannerite*

15  and *Cabello* are about.  Right?  So, yes, your Honor, I do

16  think they govern.

17         But the other thing is -- the difference, I think,

18  between *Bustos* and here is that the allegations in the

19  complaint -- so the only reason that the plaintiffs have

20  had to acknowledge the existence of these Tweets is because

21  I wrote them a Rule 11 letter attaching them.  Right, your

22  Honor, every single one of those Tweets is in this

23  complaint because I said to the plaintiff, Go back and look

24  at your Twitter feed, because you're supporting QAnon.

25  That's how they got into the complaint.  And you can see

1                            PROCEEDINGS                        55

2   that by comparing the first complaint and the second

3   complaint.

4           The plaintiff is the person who has said if you

5   look at my Twitter feed, you would see I was pellucidly

6   innocent.  Right?  That's in the complaint itself.  And I

7   think that's different than *Bustos*.  *Bustos* was talking

8   about things that could only be discovered in discovery.

9   They weren't talking about the things that were actually

10  integral to the complaint itself.  The plaintiff has put

11  into issue what he said on Twitter.  And that should be

12  enough to undercut his ability to carry his burden under

13  *Tannerite*.  Right?  He's got the burden of pleading facts

14  that prove falsity.  He has said his Twitter feed makes him

15  pellucidly innocent.  But that's not right.

16          THE COURT:  Right.  But, obviously, *Bustos* got

17  past the motion to dismiss and got to discovery, and it

18  went to summary judgment.

19          MS. BOLGER:   We don't even know if there was a

20  motion to dismiss, your Honor.

21          THE COURT:  Well, okay, he got past the pleading

22  stage, so --

23          MS. BOLGER:   But *Tannerite* didn't exist, right,

24  your Honor?  So that's one thing.  And the other thing is I

25  guess he got past the pleading stage, your Honor, but I

1                              PROCEEDINGS                    56

2   don't know if there was even a motion.

3            THE COURT:  All right, okay.  Anything else?

4            MS. BOLGER:   Oh, the other thing, of course, is

5   that there's nothing in the report that talks about the

6   words "extremism" or "violence" or "insurrection" or any of

7   those words are not actually in the reports.  What the

8   plaintiff is doing is imposing them from that Anderson

9   Cooper discussion on January 31st.  But, of course, they're

10  not in the report --

11           THE COURT:  Well, they don't say that, but there

12  are pictures of the riot on January 6th.  There's about a

13  minute of footage of January 6th in the video.

14           MS. BOLGER:   But they certainly don't call the

15  plaintiffs extremists or violent or racist in an overt way

16  in the report.  The words just aren't there.

17           THE COURT:  The words aren't there, but I mean,

18  the images are there.

19           MS. BOLGER:   The images don't include the

20  plaintiffs, your Honor.

21           THE COURT:  It's a three-minute video.  The

22  plaintiffs are in the video, and there's a minute of

23  January 6th in there.  It's hard to parse that out.

24           MS. BOLGER:   I think that actually the

25  requirement that you parse the report as a whole means that

1  

2   you can't just say well, because their image is there, it's

3   calling them everything in the video.  Right?  You're

4   required to parse what the video actually says about the

5   plaintiff as opposed to the video.  That's --

6          THE COURT:  But the picture is there, and it says

7   "QAnon follower" below it.  You keep switching back and

8   forth.  One minute you want me to look at the whole video;

9   the next minute you want me to only look at what was --

10         MS. BOLGER:   We want you to look at the whole

11  video, your Honor.  I always want you to look at the whole

12  video.  I want you to look at the whole video because, one,

13  you're required to under the law that says that you're

14  required to do that, *Mann v. Abel*, right?  That's the --

15  and the *Bray* case.  That is the rule; you are required to

16  look at the whole video.  But the of-and-concerning

17  analysis looks to whether the defamatory statements are of

18  and concerning the plaintiff.  It's not whether the

19  plaintiff is just in the video; it's what the video says

20  about the plaintiff.  And I would argue, your Honor -- and

21  I know I'm not convincing you -- that the video only -- the

22  only thing the video says about the plaintiffs is that they

23  were standing next to Michael Flynn, nothing else.

24         THE COURT:  All right, yes, you're right; you're

25  not convincing me on that.

```
 1                        PROCEEDINGS                    58

 2          Mr. Biss, any last word before we wrap up?

 3          MR. BISS:  No, your Honor.

 4          THE COURT:  Okay.  Could I ask the parties to

 5  please order a transcript of today's argument and get that

 6  to me as soon as possible?  We'd like to get a decision out

 7  to you shortly.

 8          MS. BOLGER:   Certainly, your Honor.

 9          THE COURT:  And I don't know if there -- I think

10  the cases that you mentioned you either gave me the cites,

11  but if there are any other cites that you want me to

12  consider, just -- on Monday just submit a letter with any

13  cites that either side --

14          MS. BOLGER:   Your Honor, I happen to have all of

15  the case -- many of the cases --

16          THE COURT:  Perfect.  I have them all --

17          MS. BOLGER:   -- if you want --

18          THE COURT:  No.  I have them all.  Thank you.

19          So either of you, if there are any other cases

20  that you mentioned or you think of after this, just get

21  those to me by Monday.  Okay?

22          All right.  Thank you, both.  We're adjourned for

23  today.  Have a good afternoon.

24              (Whereupon, the matter is adjourned.)

25
```

```
 1                                                        59

 2

 3                    C E R T I F I C A T E

 4

 5          I, Carole Ludwig, certify that the foregoing

 6   transcript of proceedings in the case of Flynn et al v.

 7   Cable News Network, Inc., Docket #21-cv-02587-GHW-SLC, was

 8   prepared using digital transcription software and is a true

 9   and accurate record of the proceedings.

10

11

12

13   Signature_____

14                    Carole Ludwig

15   Date:    October 18, 2021

16

17

18

19

20

21

22

23

24

25
```