## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

### CASE NO: 8-22-CV-00343-MSS-SPF

| | |
|---|---|
| VALERIE FLYNN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| CABLE NEWS NETWORK, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| _____ | ) |

## DEFENDANT CABLE NEWS NETWORK INC.'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendant Cable News Network, Inc. ("CNN") moves for summary judgment dismissing the claims of Plaintiff Valerie Flynn ("Plaintiff" or "Valerie"). In support thereof, CNN states as follows:

### PRELIMINARY STATEMENT

This is a defamation lawsuit about a CNN news report published on February 4, 2021, about a gathering of QAnon followers at a conference in October 2020 (the "Report").

But the story starts long before that. On June 24, 2020, the online poster calling itself Q directed its followers to recite the oath of office federal officials take to defend the United States Constitution, followed by the phrase "Where We Go One,

We Go All" ("WWG1WGA" or "QAnon Slogan"), a phrase that by then had gained popularity among Q and its followers. Hours later, Twitter users began posting videos of themselves taking the oath and reciting the QAnon Slogan along with the hashtag #TakeTheOath, a direct reference to Q's instructions. A viral #TakeTheOath movement followed.

Within days, Valerie, the sister-in-law of Retired General Michael Flynn ("Gen. Flynn"), began receiving Facebook messages from her sister-in-law, Lori Flynn ("Lori") (Gen. Flynn's wife), encouraging Valerie to join the #TakeTheOath movement. A few days later, at a Fourth of July barbecue at the home of Jack and Leslie Flynn, Valerie joined her other family members in a #TakeTheOath video (the "Oath Video"). The press extensively covered the #TakeTheOath movement, its clear connection to Q, and the conspiracy theories espoused by Q, or QAnon. That reporting included coverage of the Flynn family Oath Video and levied accusations that Valerie and her family were amplifying QAnon conspiracy theories by participating in the #TakeTheOath movement and promoting it online.

Seven months later, on February 4, 2021, in the wake of the riot at the United States Capitol on January 6, 2021, CNN published the Report, which is about a QAnon gathering in October 2020. During the entirety of the Report, CNN displayed a banner across the bottom of the screen that read, "CNN Goes Inside a Gathering of QAnon Followers" (the "Chyron"), which referenced the Q Con Live! conference that is the focus of the Report. As part of the Report, CNN journalist Donie O'Sullivan discusses then President Donald Trump's refusal to disavow

QAnon and Gen. Flynn's public promotion of the QAnon Slogan in the Oath Video. The Report includes an approximately two-second clip from the Oath Video Valerie's family posted on Twitter with her knowledge. The clip shows Gen. Flynn standing next to Valerie and his other family members with their right hands raised as he (and he alone) says "Where We Go One, We Go All." Valerie is silent in the clip. The only depiction of Valerie at all is as she was in the Oath Video her family members published. Nonetheless, after Valerie's husband Joseph told Valerie about the Report, she now seeks $100 million from CNN because she complains the Report labeled her a QAnon follower.

The Report does not label Valerie a QAnon follower. This, alone, dooms her claim. But even if Valerie's strained interpretation of the Report were correct, summary judgment should still be granted for several additional reasons. Valerie presents no genuine issue of material fact to support either a defamation *per se* or by implication claim. Instead, she relies on extrinsic evidence, false narratives, and tortured interpretations. There is nothing defamatory about Valerie in the Report. Moreover, Valerie cannot meet her burden of demonstrating that the Report is materially false because it is substantially true. Finally, the Report was not published with the requisite level of fault required by the First Amendment, and did not damage her. There is no genuine issue of material fact as to any of these matters, and CNN is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

### A.   The Parties

1.   Valerie is a resident of Florida and is the sister-in-law of Gen. Michael Flynn. Dkt. 58, Second Amended Complaint ("SAC") ¶¶ 8, 25. CNN owns and operates numerous news platforms and services, including the television network known as CNN and the website www.cnn.com. Declaration of Katherine M. Bolger ("Bolger Decl.") ¶ 1.[1]

### B.   The QAnon Conspiracy Generally

2.   "QAnon" is an American conspiracy movement that began in 2017. It centers on fabricated claims that a high-ranking government official called "Q Clearance Patriot" or "Q" is leaking top secret information about a Deep State cabal on online forums. Q's posts, called "Q Drops," of which there have been just shy of 5,000, claim that Trump was the only one who could save America. Ex. 10 at 5.

3.   Members of the QAnon movement have a range of beliefs. *Id.* at 4-5; Ex. 12 at 187-188. In fact, Q encouraged his followers to "do their own research" and use memes (a graphic or image often accompanied by text that is shared online) to spread the word about the Q drops. Ex. 63 (instructing "memes at the ready. WWG1WGA! Q"); Ex. 24 at 43:16-21. For this reason, posting on social media is central to the QAnon movement, Ex. 24 at 43:12-21; Ex. 4 ¶ 15, and posting about Q by social media influencers greatly increased the movement's reach. QAnon

---

[1] Unless otherwise indicated, all further references to "Ex. _" in this Memorandum of Law refer to the numbered exhibits attached to the concurrently-filed Bolger Declaration.

supporters believe that Q "tells us to stay on Twitter . . .  because we have to fight on those platforms." Ex. 13 at 2:23-3:28; *see also id*. 1:00-2:22; Ex. 14 at 6:13-10:01.

4.      Q also instructed his followers on October 17, 2020, to deny they are QAnon followers, specifically instructing them to claim there is Q, there are Anons, but there is no QAnon. Ex. 68; *see also* Ex. 24 at 34:2-6; Ex. 25 at 79:1-9.

5.      Q also uses language that unites its followers, including catch phrases such as the "Storm" and the "Great Awakening." Ex. 10 at 19-20. Among them is the phrase "Digital Soldiers," which was coined by Gen. Flynn in November 2016 to describe those who post content online, including "memes," "to get the truth out from . . . censorship[.]" Ex. 20 at 103:12-104:9; 196:15-17.

**C.      "Where We Go One, We Go All" is a QAnon Slogan**

6.      No phrase, however, is more associated with QAnon than the QAnon Slogan "Where We Go One, We Go All" and its abbreviation "WWG1WGA." Ex. 10 at 11-12; *see also* Ex. 12 at 93, 160; Ex. 25 at 222:2-4.

7.      The origin of the phrase is enmeshed in QAnon lore. The phrase was first used in Q Drop #513, on January 8, 2018, Ex. 61, and many QAnon supporters wrongly believe that the phrase was engraved on a bell on President Kennedy's sailboat. In fact, it comes from the 1996 film *White Squall*. Ex. 4 ¶ 17; Ex. 10 at 13; Ex. 12 at 21. And the picture of the engraved bell that many QAnon followers, including several members of the Flynn family, claim is from Kennedy's boat is in fact a still photo from *White Squall* that was published in a Q Drop. *See* Ex. 64.

8.      Q has used either "Where We Go One, We Go All" or

"WWG1WGA" in 201 posts. Ex. 10 at 12. QAnon followers used it extensively on social media, often with other hashtags like #QAnon, to signify membership in the QAnon community. Ex. 22 at 138:8-10; Ex. 23 at 36:16-21. In fact, its connection to the QAnon movement was so well known that Twitter banned users (including Gen. Flynn and Lori) who used it on several occasions in 2020 and 2021. Ex. 95; *see also* Ex. 17 at 332:23-333:11. The phrase also appeared on clothing, hats, flags and other merchandise. Ex. 10 at 12.

9.      Courts have described "Where We Go One, We Go All" as "a slogan used by adherents of the QAnon conspiracy theory." *United States v. Languerand*, 2021 WL 3674731, at *3 (D.D.C. Aug. 19, 2021). Political candidates who share the phrase, even once, have been labeled "QAnon believers" or "supporters" both in the media and by Valerie's purported expert. *See* Ex. 10 at 8; Ex. 12 at 200 n.55; Ex. 85.

10.      Despite alleging in the SAC that "Where We Go One, We Go All" is a "statement of family unity" and "family solidarity," SAC ¶ 10 & n.4, Valerie testified that the "very first time" she ever heard the phrase was "when [she] said it" in the video filmed on July 4, 2020. She also testified that she and her family had never taken the oath prior to that date. Ex. 18 at 124:3-10.

**D.    Gen. Flynn and His Family Exploited His Connections to QAnon**

11.      Gen. Michael Flynn, Valerie's brother-in-law, is one of the most high-profile and influential figures in the QAnon movement. Ex. 12 at 5, 44.

12.      Gen. Flynn's prosecution for lying to the FBI and ultimate pardon by Trump galvanized support from QAnon followers, who acted like "groupies"

6

towards Gen. Flynn. Ex. 19 at 188:18-189:14. Q referenced Gen. Flynn in scores of Q drops, and members of the Q movement show their support for Gen. Flynn by adding three stars to their Twitter handle (meant to signify his rank as a three-star general); creating, sharing and liking memes featuring him; and using hashtags like #ClearFlynnNow and #IStandWithFlynn, in conjunction with #WWG1WGA and #QAnon. Ex. 17 at 345:5-346:4; Ex. 10 at 7 n.5.

13.     Because of the frequency of the Gen. Flynn references in Q Drops and the support for Gen. Flynn among Q's followers, many suspected Gen. Flynn was Q. Ex. 17 at 169:8-170:7; *see* Ex. 12 at 20. As Valerie testified, she knew of "a comical mention of people thinking that General Flynn was Q." Ex. 18 at 135:9-20.

14.     Most importantly, from 2018 to 2021, Valerie's family, including her husband, sisters-in-law, and brothers-in-law, relentlessly fundraised for Gen. Flynn's Legal Defense Fund from the QAnon community by promoting the Legal Defense Fund on social media and QAnon-associated shows. Ex. 17 at 345:20-346:1; Ex. 19 at 125:18-126:2; 232:18-233:25; Ex. 96. This includes the Legal Defense Fund's Trustee and Gen. Flynn's sister, Barbara Flynn Redgate, who agreed that she "didn't mind taking money from people who [used QAnon] hashtags" as long as they were "directing [people] to the legal defense fund." Ex. 128 at 94:25-95:25.

15.     Valerie testified that she knew her husband, Joe Flynn, was invited on a show hosted by QAnon personality John B. Wells, Patriot's Soapbox, "to create awareness" of the Legal Defense Fund. Ex. 18 at 194:2-13. And she attended an in-person fundraiser hosted by Wells. Ex. 21 at 87:21-90:6, 90:19-21.

16.     Barbara testified that, once legal fees were paid, the Flynns themselves received the remainder of the funds.  Ex. 128 at 135:11-25; 136:14-25; 137:1-12.

**E.     The #TakeTheOath Movement**

17.     On June 24, 2020, 20 minutes after the D.C. Circuit Court of Appeals (temporarily) ordered Judge Sullivan to dismiss the charges against Gen. Flynn, Q posted "The People's General. Soon" followed by three stars. Ex. 65; Ex. 11 at 14. Approximately two hours later, Q posted Drop #4510 (Ex. 66):



18.     Shortly thereafter, QAnon followers began filming themselves reciting the oath and posting the video along with #TakeTheOath, #QAnon, and #Qdrop. Ex. 11 at 18. By June 25, 2020, there were 76,600 tweets with #TakeTheOath, many of which had QAnon iconography, used #WWG1WGA, and showed the speaker with Q shirts or Q flags when they took the oath. Ex. 10 at 15; Ex. 11 at 20-21.

19.     On June 27, 2020, Gen. Flynn changed the text of his Twitter profile to include #TakeTheOath, along with a U.S. flag emoji. Ex. 10 at 15; Ex. 11 at 21-22.

20.     On June 30, 2020, Valerie received a Facebook message from Lori, urging her to "Take the oath! Pass it on!" with a link to a tweet by user

@wgabrittany (with the username "BrittanyWWG1WGA") using the hashtags #TakeTheOath, #qanon, #wwg1wga, before concluding with "God bless the United States of America." Ex. 44; Ex. 46 at 15.

21.     On July 3, 2020, Valerie received *another* message from Lori urging her to take the oath, this time linking to a tweet by user @CourtSalinas with the hashtags #TakeTheOath and #WWG1WGA and phrase "God Bless America." Exs. 45-46.

### F.     The Flynns #TakeTheOath

22.     The day after Valerie received Lori's second message, the Flynn family—including Gen. Flynn, Valerie, Lori, Joe, Jack and Leslie—decided to join the #TakeTheOath movement on the Fourth of July in 2020. At Lori's encouragement, Valerie participated in the "movement going around saying 'Take the Oath,' and we all thought that was a great thing. Let's take the oath. That's why we did it. Simple as that, really." Ex. 17 at 34:17-25. Jack Flynn and Gen. Flynn also testified they knew about the #TakeTheOath movement before filming the Oath Video. Ex. 19 at 31:21-32:19; Ex. 20 at 30:5-25.

23.     Contrary to her SAC, where Valerie claimed the oath "was completely impromptu" (SAC ¶ 8), the Flynns testified that, almost assuredly at Lori's suggestion, they actually left the party that was in Jack and Leslie Flynn's adjacent backyard to film themselves taking the oath in Lori and Gen. Flynn's backyard. Ex. 17 at 27:3-13; 48:14-16. The only other people present were Sidney Powell and her son, Wilson. Once the Flynns lined up, Wilson filmed Valerie and her family raising their right hands and reciting the federal oath of office and adding "Where We Go

One, We Go All" at the end, just like the Q Drop instructed and just as was done in the two videos forwarded to Valerie by Lori. *Compare* Ex. 2 *with* Ex. 66; *see also* Ex. 19 at 31:18-20 ("Q. I'm asking you [Jack] if the words [in Q Drop 4510] are the same as what you see here [in the Oath Video]. A. The words are the same."). The Flynns also added the words "God Bless America," as did other QAnon followers who included those words in their #TakeTheOath Twitter posts, like Barbara, @WgaBrittany, and @CourtSalinas. Exs. 44-45.

24.     The Flynns filmed the Oath Video twice because "someone said they could resay it better." Ex. 88 at 53:7-12; *see also* Ex. 19 at 17:20-18:9; Ex. 20 at 30:20-22, 31:13-17.

25.     Just as planned, and with Valerie's knowledge, Gen. Flynn published the Oath Video on Twitter within a few minutes of filming it. Ex. 18 at 115:9-15, 119:19-24; *see also* Ex. 41. Valerie testified that at the time she "thought [the Oath Video] would go viral" and recalls asking her family, "Are people seeing it?" Ex. 18 at 115:21-23; 116:11-15. Additional video footage taken by Valerie shows her husband enthusiastically predicting to the family that the video would "go viral." Ex. 18 at 115:16-23; 116:1-6, 11-15. The Flynn family members are heard asking "How many views?" to which Gen. Flynn responds "Let it ride." Ex. 19 at 48:9-18; Ex. 16. And ride it did. It has been viewed over 2.4 million times, retweeted 18.9 thousand times, and liked 56.5 thousand times. Ex. 11 at 25; *see also* Ex. 20 at 30:20-22. Lori and Jack also retweeted the oath the following day to their thousands of followers. *See* Ex. 17 at 149:7-150:16; Ex. 48 at 2-4.

26.     For those within the QAnon movement, Gen. Flynn, Valerie, and their family's participation in #TakeTheOath was seen as public validation of QAnon. Ex. 4 ¶ 22. Prominent QAnon-affiliated individuals noted that the timing of the Oath Video was "close in time to this Q Drop." *See* Ex. 24 at 75:3-23.

### G.     Media Report the Oath Video As Featuring a "QAnon Slogan"

27.     The Flynns' posting of the Oath Video set off a media firestorm. Media entities across the political spectrum reported that the Flynns took a "QAnon oath" and described WWG1WGA as a "QAnon slogan." Ex. 70. In total, at least 45 news articles and countless social media posts referenced Gen. Flynn taking the QAnon oath as part of the #TakeTheOath movement. *Id. The Washington Examiner* reported that Gen. Flynn and those pictured in the video, like Valerie, "quot[ed] a popular Q[A]non slogan—'Where we go one, we go all!'" and that the "'Take The Oath' movement appears to have started online sometime in late June." Ex. 75. *Salon* reported that Gen. Flynn's #TakeTheOath Twitter post "tagged his wife Lori Andrade, his brothers Jack [and] Joseph, his sisters Barbara Redgate, and Mary O'Neill[.]" Ex. 76. And most of those articles linked to the Oath Video, included a screenshot from it, or embedded Gen. Flynn's tweet or the Oath Video itself in the article. *E.g.*, Ex. 71.

28.     Valerie's purported expert wrote, "Gen. Flynn himself pledged allegiance to QAnon on July 4, 2020, in which he added the phrase to the standard oath of office 'Where we go one we go all.' Flynn then posted the video to Facebook, Twitter, and other platforms ensuring that his oath of allegiance went viral." Ex. 12

at 20.

29.     Despite this contemporaneous media coverage, no member of the Flynn family removed the Oath Video from Twitter. In fact, they "stand by it." Ex. 17 at 153:4-22; *see also* Ex. 20 at 435:21-437:19. Valerie testified that she has never asked Gen. Flynn to take the video down either. Ex. 18 at 131:23-132:4.

30.     The Oath Video remained available on Twitter until January 8, 2021, when Gen. Flynn's Twitter account was suspended as part of the post-January 6 suspensions of accounts "primarily dedicated to sharing QAnon content." Ex. 20 at 171:3-4; Ex. 95. When Gen. Flynn was reinstated on Twitter on January 6, 2023, the Oath Video remained on his Twitter page and is available for view to this day.

**H.     CNN's Newsgathering for the Report at Issue**

31.     The connections between the Flynn family and QAnon were known to CNN journalist Donie O'Sullivan before he created the Report at issue. O'Sullivan has followed QAnon for several years, publishing numerous articles and television packages on the movement. Ex. 4 ¶¶ 9, 12-16, 22, 30-31, 38. O'Sullivan was also aware of Q Drop #4510, the #TakeTheOath movement, the Oath Video, and CNN and other outlets' prior reporting on the Flynns' Oath Video. *Id.* ¶¶ 20-31.

32.     On October 17, 2020, O'Sullivan attended a QAnon convention called Q Con Live! in Scottsdale, Arizona. *Id.* ¶¶ 32-34. While there, O'Sullivan saw and heard repeated exclamations of "Where We Go One, We Go All"; saw the Q Con Live! attendees' positive response to Trump's refusal to disavow QAnon at the NBC town hall; observed the importance of social media to QAnon; and witnessed Q Con

Live! speakers' favorable references to Gen. Flynn. *Id.* ¶¶ 34-37.

## I.   CNN's Preparation of the Report at Issue

33.   Following O'Sullivan's reporting for CNN on the Capitol riot, he realized that some of the individuals who had attended Q Con Live! also participated in the riot. *Id.* ¶¶ 40-41. A few weeks later, in early February 2021, O'Sullivan pitched a television news package to CNN's nightly news show, CNN Tonight, seeking to shed new light on the relationship between QAnon and Trump and his enablers, by referencing his reporting from Q Con Live!. *Id.* ¶¶ 42-44.

34.   After CNN Tonight accepted the pitch, O'Sullivan began writing the script and determining which elements, such as video, would be featured. *Id.* ¶¶ 45-46. By the morning of February 4, 2021, O'Sullivan had prepared a draft script that included a two-second clip from the Oath Video showing Gen. Flynn reciting the words, "Where We Go One, We Go All." *Id.* ¶ 47. The editor assigned to the Report cut those clips based on O'Sullivan's script. *Id.* ¶ 50.

35.   O'Sullivan chose to include the Oath Video clip because it was newsworthy that a political figure like Gen. Flynn had promoted the same QAnon Slogan, "Where We Go One, We Go All," used at Q Con Live!. *Id.* ¶¶ 47-49. For that reason, although O'Sullivan knew that Lori and the other Flynns repeated the QAnon Slogan, he did not include video of them saying those words. *Id.* ¶ 48.

36.   O'Sullivan sent the final script for review to among others, Fuzz Hogan at the Row, CNN's editorial oversight department, and Emma Lacey-Bordeaux at

Standards and Practices, CNN's department dedicated to ensuring content is consistent with ethical and professional standards. *Id.* ¶ 61; Ex. 6 ¶¶ 2, 17; Ex. 8 ¶¶ 2, 16. The script was approved by Hogan, who confirmed the Report was factually accurate, and Lacey-Bordeaux. Neither Hogan nor Lacey-Bordeaux flagged the portion of the Report in which the Oath Video appeared as problematic, and they believed the Report to be fair and accurate. Ex. 4 ¶¶ 61-64; Ex. 6 ¶¶ 4, 31-32, 37-38; Ex. 8 ¶¶ 4, 24- 26, 31-32. O'Sullivan supervised the physical assembly of the Report and saw and approved the complete Report prior to airing. Ex. 4 ¶¶ 39, 50, 69.

37.     After the Report's script was finalized, a Chyron, or a banner that appears on the lower third of the screen, reading "CNN Goes Inside a Gathering of QAnon Followers" ("Chyron") was added before the Report aired. *Id.* ¶ 73; O'Sullivan did not create the Chyron, but as a matter of standard practice, the CNN show airing the news package would have prepared the Chyron, and CNN often runs chyrons during the entirety of news reports. *Id.* ¶¶ 73-74; Ex. 8 ¶ 30. Here, the Chyron's words were the exact same as those in the Report.  Pulling the text of the Chyron from the script of the news package is one of the common ways that chyrons are created. Ex. 4 ¶ 75. O'Sullivan, Lacey-Bordeaux, and Hogan have since reviewed the Chyron, and they believe that it fairly and accurately reflects the Report because of the Report's overall focus on Q Con Live!, and that it does not call Valerie a QAnon follower. Ex. 4 ¶¶ 74-78; Ex. 6 ¶ 37; Ex. 8 ¶ 31-32.

38.     O'Sullivan, Lacey-Bordeaux, and Hogan believed at the time it was published, and believe now, that the Report was fair and accurate. They also believe

that the Report did not depart from the Row's editorial standards, CNN's ethical and professional standards and practices, or the standards of care associated with responsible journalism. Ex. 4 ¶¶ 4, 81; Ex. 6 ¶¶ 4, 38; Ex. 8 ¶¶ 4, 32.

39.     The Report aired for the first time on CNN Tonight at 10:45 PM ET on February 4, 2021, and later aired four other times: a CNN Tonight replay at 2:48 AM on February 5, 2021; on CNN Newsroom at 3:49 PM; on New Day Saturday at 7:33 AM on February 6, 2021; and on CNN Newsroom at 3:30 PM on February 6, 2021. Ex. 4 ¶¶ 3, 79.

### J.     The Report

40.     The Report, which is approximately three minutes and 50 seconds, is largely composed of footage of O'Sullivan's attendance at Q Con Live!. Ex. 1. The Chyron remains at the bottom of the screen during the entirety of the Report, including O'Sullivan's interview with Don Lemon on air after the Report concludes. *Id.*; Ex. 4 ¶ 74. The Report opens with several statements at Q Con Live! criticizing the mainstream media, before flashing to footage of O'Sullivan wearing a mask at Q Con Live!. Ex. 1. Within the first 20 seconds of the Report, O'Sullivan explains that the footage was from "this gathering of QAnon followers in Arizona just two weeks before November's election." *Id.* The Report then shows the QAnon Shaman at Q Con Live! followed by an image of him at the January 6 attack. Next, the Report features J.T. Wilde playing his song "Where We Go One, We Go All" at Q Con Live!, which O'Sullivan describes as an "infamous QAnon slogan promoted by Trump's first national security adviser, Michael Flynn" that was also "played as an

anthem at this meeting of Trump supporters [Q Con Live!]." *Id.* During O'Sullivan's explanation, the Report shows photos of the phrase in full, abbreviated as "#WWG1WGA," and printed, with the letter "Q," on large flags, followed by a clip of Gen. Flynn with Trump at a campaign rally. *Id.* O'Sullivan's statement is then followed with a two-second clip of the Oath Video showing Gen. Flynn reciting, "Where We Go One, We Go All." *Id.* Valerie, who is not named, is also visible in the clip, but is not shown speaking any words. *Id.* The Report does not describe QAnon as a "cult" or mention a high-ranking government insider known as Q exposing a cabal of Satan-worshipping pedophiles that controls the government. *Id.*

41.     The Report also shows Q Con Live! attendees cheering Trump's refusal to disavow QAnon during a town hall with journalist Savannah Guthrie. *Id.* The Report also identified "prominent figures" in the QAnon movement and closes with O'Sullivan's interview with Travis View, the host of a QAnon podcast, and a final shot of J.T. Wilde singing "Where We Go One, We Go All." *Id.*

42.     Valerie admits that she learned of the Report from Joe, months after it aired, who said that CNN had done a "hit piece" on the Flynn family and "showed [her] the picture of [the Oath Video] with a banner with . . . QAnon gathering [.]" Ex. 18 at 12:18-13:7. It was not until nine months later that she saw the full Report, and she concedes that she is not named in it. *Id.* at 12:12-21; 16:14-15.

**K.     Valerie Continues to Associate with QAnon After the Report**

43.     Valerie worked staffing a merchandise booth at a ReAwaken America event in Colorado Springs in September 2021, where Gen. Flynn was a featured

speaker, along with other prominent personalities in the QAnon community—including Joe. Ex. 18 at 173:22-174:14. As Lori testified, the ReAwaken America tours had to keep changing venues because "the public or the local news would come out and say, QAnon followers having another ReAwaken America tour." Ex. 17 at 287:10-14. At that ReAwaken America event, Valerie recalled that "someone came up to General Flynn and asked him if [he] could please sign something" with "WWG1WGA." Ex. 18 at 109:15- 110:4.

### L.    Procedural History

44.    On February 9, 2022, Valerie sued CNN claiming that the Report falsely accused her of being a "QAnon follower." Dkt. 1 (Valerie Compl.) ¶¶ 2, 4, 6-7, 16, 24, 27. On March 7, 2022, CNN moved to dismiss Valerie's Complaint. Dkt. 18. Instead of opposing the motion to dismiss, Valerie filed her First Amended Complaint ("FAC") on March 21, 2022, again alleging defamation per se and defamation by implication. Dkt. 27. On April 11, 2022, CNN moved to dismiss the FAC, Dkt. 31, and on February 22, 2023, this Court granted CNN's motion with leave to amend. Dkt. 55. On March 15, 2023, Valerie filed her SAC. Dkt. 58. On May 5, 2023, because discovery was nearing its end, CNN answered. Dkt. 71.

### ARGUMENT

This Court should grant summary judgment because Valerie has failed to carry her burden to establish each element of her claim. Fed. R. Civ. P. 56(a). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To do so, Valerie must establish: (1) publication of a statement to a third party; (2) falsity; (3) fault (in this case actual

malice); (4) actual damages; and (5) the statement was defamatory. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)). She has not done so.

## I.      THE REPORT LACKS DEFAMATORY MEANING AND IS TRUE

### A.      The Report Lacks the Ascribed Defamatory Meaning

The Report is not susceptible of the meaning Valerie ascribes to it. Whether the challenged statement is "reasonably capable of a defamatory interpretation" is a question of law. *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714-15 (11th Cir. 1985). The key issue is not what Valerie alleges but "how a reasonable and common mind would understand the statements," which should not receive "a tortured interpretation." *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016). In construing meaning, courts are to consider "all of the circumstances surrounding the statement." *Sanchez v. Cellco P'ship*, 2006 WL 8432732, at *3 (S.D. Fla. Sept. 26, 2006). Relevant circumstances include the "publication . . . in its totality," *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983), as well as "standard practice in the [d]efendant's organization." *Sanchez*, 2006 WL 8432732 at *2–3. "Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines." *Byrd,* 433 So. 2d at 595; *see Parekh v. CBS Corp.*, 820 F. App'x 827, 835 (11th Cir. 2020) (similar). When an alleged defamatory meaning flows from a chyron shown throughout an entire telecast, the telecast must be viewed as a whole because the chyron may be "temper[ed]" by the full telecast, clarifying it "in such a way that no

[viewer] could reasonably believe [its] defamatory meaning." *Crall v. Gannett Satellite Info. Network, Inc.*, 1992 WL 400713, at *3 (S.D. Ohio Nov. 6, 1992); *see, e.g.*, *Rubin v. U.S. News & World Report*, 271 F.3d 1305, 1307-08 (11th Cir. 2001).[2]

Here, Valerie's sole argument is that the Report accuses her of being a QAnon follower because of the Chyron that is shown throughout the entirety of the Report.[3] Valerie's argument is based almost entirely on a screenshot of one still from the four-minute Report. SAC ¶ 13. This Court, however, must review the Report as a whole because the Chyron is tempered by its full contents. Initially, the Chyron explicitly refers to Q Con Live! because within the first 20 seconds of the Report, O'Sullivan explains, using the same words as the Chyron, that the footage was from "this *gathering of QAnon followers* in Arizona just two weeks before November's election." *Id.* (emphasis added). And the Report, as a whole, does not imply, let alone state, that Valerie attended Q Con Live!. In fact, the Report does not mention Valerie at all. Instead, the Report's discussion of "Where We Go One, We Go All" refers *only* to Trump and Gen. Flynn. And, the Report shows *only* Gen. Flynn speaking the phrase. As such, the only way a viewer would even know that Valerie said "Where We Go One, We Go All" is if the viewer had seen the entire Oath Video as first posted by the Flynns (not CNN). Valerie's belief that the Report accused her of being

---

[2] *See also Kronk v. Am. Media, Inc.*, 2015 WL 3473205, at *3 (Fla. Cir. Ct. Mar. 30, 2015).

[3] In the related S.D.N.Y. litigation, the magistrate judge held that at the pleading stage, the plaintiffs sufficiently alleged that CNN called them QAnon followers, but solely for the purposes of analyzing the "low bar" "of and concerning" element of their claims. *Flynn v. CNN*, 2021 WL 6290046, at *13 (S.D.N.Y. Oct. 22, 2021). She did not reach the issue of whether those plaintiffs' proffered interpretation of the Report—the same as Valerie's—was reasonable as a matter of law, nor did she have available discovery establishing the unreasonableness of Valerie's interpretation.

a QAnon follower is unreasonable.

This point is underscored by the fact that the Chyron remains on the screen for the entirety of the Report. If the presence of the Chyron alone were enough to label someone on the screen a "QAnon follower," then CNN's audience would understand every individual who appeared on screen—including Trump, O'Sullivan, Savannah Guthrie, Don Lemon, and View—to be a "QAnon follower." This cannot be right. Moreover, none of those involved in the writing or production of the Report understand the Chyron that way. Statement of Facts ("SF") ¶ 37.

In this way, this case is just like *Parekh*. There, the plaintiff sued the defendant about a report that allegedly implied that he was involved in his girlfriend's scam by including a photograph of him and his girlfriend and the statement that they moved to Florida once "people started getting suspicious." *Parekh*, 820 F. App'x at 831. But the court held that "viewed in the context of the entire news report," neither the statement nor the picture supported the plaintiff's claim because the report clearly noted that the plaintiff felt he was lied to by his girlfriend and that the two of them broke up. *Id.* at 835. "Given this context, an ordinary reader would not understand the [statement and photograph] to have [or imply] a defamatory meaning." *Id.* at 833*; see also Valentine v. C.B.S., Inc.,* 698 F.2d 430, 431-2 (11th Cir. 1983) (plaintiff not defamed by individual lyrics because "review of the entire song" established that plaintiff's interpretation was "tortured and extreme"). Here, as in *Parekh* and *Valentine*, no reasonable viewer watching the entire Report would understand the Chyron to state that Valerie was a QAnon follower because everything else in the

Report points away from such a meaning. Valerie's proffered meaning of the Report should be rejected.[4]

### B.     The Report as Published Is Literally True

Further, what the Report *actually* says and shows is literally true. Falsity "is the *sine qua non* for recovery in a defamation action." *Byrd,* 433 So. 2d at 595. As discussed above, the only portion of O'Sullivan's narration referencing the Oath Video states that Gen. Flynn "promoted" the QAnon Slogan. And there is no question that statement is literally true. Gen. Flynn filmed the QAnon Oath and posted it to Twitter as part of #TakeTheOath. And scores of articles—and Valerie's own purported expert's book—reported on his closeness to QAnon. In fact, he is associated so closely with QAnon that many thought he himself was Q. *See* SF ¶ 13.

To the extent that the Report is about Valerie at all, it shows an admittedly and literally truthful fact that Valerie stood near Gen. Flynn by the fire outside his home and raised her right hand while Gen. Flynn said "Where We Go One, We Go All." Because the Report as actually published—as opposed to the way Valerie mischaracterizes it in the SAC—is literally true, the SAC must be dismissed.

---

[4] In discovery, Valerie has taken the position that the SDNY suit both determined that the Report calls her a QAnon follower and conclusively defined the term. This is incorrect. There, the court's ruling that Jack and Leslie Flynn had sufficiently pled defamatory meaning based on their definition of "QAnon follower" was cabined by his recognition that resolution of the issues is "a highly fact-intensive inquiry," and the court could not "discredit" allegations at the pleading stage. *Flynn v. CNN*, 2021 WL 5964129, at *4 (S.D.N.Y. Dec. 16, 2021). Not only did the court lack the benefit of discovery, but it goes without saying that a ruling by a different court at an earlier stage is inapplicable. *See Munro v. Fairchild Tropical Botanic Garden, Inc.*, 2022 WL 452257, at *6 n.4 (S.D. Fla. Jan. 13, 2022).

## II.   VALERIE CANNOT ESTABLISH THE REPORT IS DEFAMATORY *PER SE*

Valerie has also failed to allege—and, in discovery, did not elicit evidence to prove—that the Report is *per se* defamatory. Defamation may be "established *per se* or *per quod*." *Anderson v. Smith*, 2020 WL 10058207, at *1 (M.D. Fla. Mar. 24, 2020). A publication is libelous *per se* "if, when considered alone and without innuendo, it . . . tends to subject one to hatred, distrust, ridicule, contempt, or disgrace" and if its words "upon their face and without the aid of extrinsic proof [are] injurious." *Id.* at *2. "[L]ooking outside the four corners of the [publication] . . . would run afoul [of] the very nature of a *per se* action." *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1259-60 (S.D. Fla. 2021).

In the Order dismissing the FAC, this Court held that Valerie did not establish defamation *per se* because she relied on "extrinsic sources to provide evidence of the defamatory nature of the Publication." Dkt. 55 ("Order") at 11. And Valerie did not remedy that deficiency. Valerie claims the Report is defamatory *per se* because CNN "falsely stated. . . that Valerie was an acolyte, adherent, convert and disciple of . . . QAnon," a "dangerous, violent, racist, extremist, insurrectionist movement." *Compare* SAC ¶¶ 1, 28, *with* FAC ¶ 4. But the Report itself contains *none* of that language. Instead, as before, Valerie plainly relies on extrinsic evidence to define "QAnon," including the FBI and DHS, SAC ¶ 1; the *Wall Street Journal*, *id.*; and several *different* CNN telecasts and articles, *id.* ¶¶ 1, 27.

Valerie attempts to salvage her claim by alleging that in February 2021, the

words "QAnon follower" were themselves inherently injurious. SAC ¶ 32. But this Court already rejected that argument, holding "the statement that Plaintiff is a QAnon follower is not inherently injurious." Order at 11. And, in any event, not only does the meaning of QAnon remain hotly contested, Ex. 10 at 4-7, but also Valerie's *own family members* did not believe the label was inherently injurious. On the contrary, her husband had no issue appearing on QAnon-associated talk shows as late as November 2021. Ex. 21 at 191:24-192:5. And her sister-in-law (and co-plaintiff) Lori said, *after* the January 6 Capitol riot, that QAnon "followers are salt of the earth Patriots!"" Ex. 97 at 146. Valerie's defamation *per se* claim fails.[5]

## III.   VALERIE CANNOT ESTABLISH DEFAMATION BY IMPLICATION

Valerie's claim for defamation by implication also fails. Valerie must show either that CNN "juxtapose[d] a series of facts so as to imply a defamatory connection between them" *or* that CNN "create[d] a defamatory implication by omitting facts," and must also show that CNN "intend[ed] or endorse[d]" the alleged defamatory implication. *See Jews for Jesus*, 997 So. 2d at 1106-07. As this Court originally found in granting CNN's motion to dismiss, Valerie has not done so.

*First*, Valerie first pleads that the Report "juxtaposed a series of true facts so as

---

[5] Nor can Valerie convert her defamation *per se* claim into one *per quod*. *See Daniels v. HSN, Inc.*, 2020 WL 533927, at *5 (M.D. Fla. Feb. 3, 2020). To state a claim under this theory, Valerie must prove "actual, out of pocket losses[,] which must be proven by specific evidence as to the time, cause and amount"—that is, special damages, caused by the Report. *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004) ("chief characteristic" is a "realized or liquidated loss"). Here, while Valerie no longer appears to claim special damages, she persists in asserting "lost future earnings and diminished earning capacity." SAC ¶¶ 37, 42. But as she testified, she has no economic harm whatsoever, let alone an economic loss solely attributable to the Report. *See* Part VI, *infra*. This alone precludes a claim for defamation *per quod*.

to imply a defamatory connection between them" (SAC ¶ 40). But this allegation suffers from the same fatal problem as in her FAC—Valerie has not identified how these true facts were juxtaposed in such a way as to imply anything other than that those truthful facts occurred. Order at 18. Specifically, the SAC asserts that CNN juxtaposed a series of facts that Valerie concedes are true: "Valerie did repeat the words, 'where we go one we go all,' . . . Valerie's hand was raised. She was taking an oath," with (2) a false chyron "so as to imply and insinuate that Valerie was a QAnon follower." SAC ¶ 40. But this is not the juxtaposition of true facts that created a false implication. Instead, per Valerie's own allegations, those true facts **only** become defamatory when juxtaposed with the allegedly *false* Chyron. In other words, Valerie alleges that CNN defamed her by juxtaposing admittedly truthful facts with a false one. *See Jacoby v. CNN*, 537 F. Supp. 3d, 1303, 1313 (M.D. Fla. 2021) (court "cannot accept as true" allegation that "this statement is false," while accepting allegation that "this same statement is true"), *aff'd*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021). That is not a claim for defamation by implication—it is simply an effort to recast the defamation *per se* claim to avoid its pleading failures. Valerie has not pled a claim for defamation by juxtaposition.

*Second*, Valerie bases her omissions theory on CNN's alleged "intentional[] and selective[] edit[ing] and alter[ing]" of the Oath Video, which she asserts implicitly defamed her by omitting footage of her speaking the federal oath of office, the words "God Bless America," and the "short celebration of cheers thereafter." SAC ¶ 40. It does not. A defamation by implication claim "cannot be founded upon

24

the omission of immaterial facts," and the challenged omissions are only material where they would "contradict[]" the alleged false implication. *Compass iTech, LLC v. eVestment All., LLC*, 2016 WL 10519027, at *18 (S.D. Fla. June 24, 2016); *see also Turner*, 879 F.3d at 1270 (irrelevant omitted information does not support implication claim). Based on this well-established principle, this Court dismissed Valerie's omission claim from the FAC. Order at 18-19. Valerie did not cure this defect either in pleading or in discovery.

In fact, discovery has made the irrelevance of the omitted information even more clear. Discovery has shown that QAnon followers used patriotic memes, view themselves as patriots, and, in fact, said "God Bless America" while participating in #TakeTheOath. SF ¶¶ 3, 5, 20-21, 23. The Flynns' patriotic statement and cheers have no relevance to—let alone do they negate—Valerie's undisputed repetition of the QAnon Slogan as part of #TakeTheOath. The defamation by implication claim based on omitted facts fails as a matter of law.

*Finally*, Valerie cannot establish, as she is required to do, that CNN "intend[ed] or endors[ed]" the alleged defamatory implication that she was a QAnon follower. *Jews for Jesus*, 997 So. 2d at 1107. Here, all of the decisionmakers involved in creating the Report testified not only that they did not intend to call Valerie a "QAnon follower," but also that they still think they did not do so. SF ¶ 37. And that testimony is supported by the editorial judgments they made in putting together the piece—CNN did not even include in the Report the portion of the Oath Video in which Valerie recites the QAnon Slogan. Instead, CNN highlighted *Gen. Flynn*'s

recitation to emphasize QAnon's prominence in U.S. politics because it was the most newsworthy portion of the Oath Video.   Valerie has identified no contradictory evidence. For this reason, the defamation by implication claim must fail.

## IV.   VALERIE CANNOT MEET HER BURDEN OF PROVING THAT THE REPORT IS MATERIALLY FALSE

Even if this Court concludes that the Report labeled Valerie a QAnon follower—which it does not—Valerie cannot meet her burden of proving material falsity. The First Amendment and Florida law require that every defamation plaintiff has the burden of proving that speech of public concern is materially false.[6] *San Juan Prod., Inc. v. River Pools & Spas, Inc.*, 2023 WL 1994087, at *4 (M.D. Fla. Feb. 14, 2023) ("According to the U.S. Supreme Court and Florida case law, falsity only exist[s] if the publication is *substantially and materially false*, not just if it is technically false.") (emphasis added); *see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986); *Cheng v. Neumann,* 51 F.4th 438, 443-44 (1st Cir. 2022).

A statement need not be literally true for the defendant to prevail.   Rather, a "statement is substantially true *if its substance or gist* conveys essentially the same meaning that the truth would have conveyed." *Jews for Jesus*, 997 So. 2d at 1107-08 (quoting *Standard Jury Instructions--Civil Cases (No. 00-1)*, 795 So. 2d 51, 57 (Fla. 2001)); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240 (11th Cir. 1999) (if

_____

[6] Here, there is no question that the Report, which focuses on Trump's refusal to disavow QAnon and Gen. Flynn's public promotion of the QAnon Slogan, is speech of public concern.  In any event, Valerie must separately prove material falsity because she is a limited public figure, *see infra* Part V.A.1.  *See Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 706 (Fla. Dist. Ct. App. 1999) ("It is constitutionally required that a public figure plaintiff prove falsity.") (citing *Hepps*, 475 U.S. at 775-776)).

"gist" or "sting" of challenged statement is substantially true, statement is not defamatory). Courts must "consider the context" of the statement and "disregard any minor inaccuracies that do not affect the substance of the statement." *Jews for Jesus*, 997 So. 2d at 1107-08; *see Wentz v. Project Veritas*, 2019 WL 1716024, at *5 (M.D. Fla. Apr. 16, 2019) (granting summary judgment where several defamatory statements were merely "recitations of [plaintiff's] own admitted actions and statements").

Here, Valerie will never be able to demonstrate the Report is materially false.[7] The "gist" of Valerie being a "QAnon follower" is that she aligned herself with QAnon, which the record has proven true. Discovery has confirmed that QAnon is an elastic conspiracy movement, and to be a QAnon follower equally so. The common denominator among QAnon followers is that in some way, they chose to align themselves with the QAnon movement.

And Valerie did that in multiple ways, most notably by standing near Gen. Flynn and her family as she spoke the QAnon slogan "Where We Go One, We Go All," in the Oath Video, mere days after she received not one but two Facebook messages from Lori urging her to "take the oath." SF ¶¶ 20-21.  And, the moment was so exciting to Valerie that she not only knew it would go viral, but also filmed her family afterward discussing the video's viral reach. *Id.* ¶ 25. Far from being an impromptu family oath, the Oath Video was an intentional, public act that Valerie willingly and excitedly participated in using a QAnon phrase.

---

[7] Courts routinely grant motions for summary judgment on substantial truth grounds. *Valentine*, 698 F.2d at 432; *Schiller*, 2016 WL 9280239, at *10; *Davis v. McKenzie*, 2017 WL 8809359, at *14 (S.D. Fla. Nov. 3, 2017), *R&R adopted*, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018).

And the media firestorm that followed, in which media outlet after media outlet reported that the Flynns said a QAnon Oath or a QAnon Slogan forever linked Gen. Flynn and his family, including Valerie, with QAnon. Valerie's participation in the Oath Video, on its own, renders the Report substantially true.

But in addition to her participation in the #TakeTheOath movement, including ensuring their Oath Video went viral, Valerie voluntarily associated herself with QAnon even after the Report aired when she both attended a Legal Defense Fund fundraiser hosted by prominent QAnon personality, Wells, but also chose to work at a QAnon conference, the ReAwaken America event in Colorado Springs in September 2021. *Id.* ¶¶ 15, 43.

Indeed, Valerie and her family aligned themselves with QAnon in ways far more public and comprehensive then other individuals who have been deemed QAnon followers and supporters. For example, in a *Media Matters* article titled "Here are the QAnon supporters running for Congress in 2020," 107 former congressional candidates who embraced QAnon during the 2020 election cycle are so listed for undertaking far fewer QAnon related activities than Valerie. Ex. 85. In fact, politicians, including Theresa Raborn and Johnny Teague, made the list simply for retweeting the Oath Video in which Valerie actually took part. *Id.* at 19-20, 22. If these acts are sufficient to deem these politicians "QAnon supporters," then the fact that Valerie has participated in #TakeTheOath and worked at a ReAwaken America event must be more than enough.

A recent case involving a QAnon-connected judge is directly on point. In

*Patrick v. Daily Beast Co.*, the court rejected that judge's claim that a *Daily Beast* headline falsely called her "QAnon-linked." 2023 WL 3627836, at *3 (E.D. Pa. May 24, 2023). The court held that "[t]he fact that [the judge] denied a QAnon link does not negate her interview with a QAnon supporter or that she was listed as a speaker for a QAnon-affiliated conference." *Id.* Moreover, the court explained that even if "the headline wasn't the most fair" when weighing her denial against her interview and appearance on a conference list (even though she claimed she did not attend the conference), this still did not support a "finding of falsity." *Id.* If the interview and conference appearance outweighed the judge's denials in *Patrick*, Valerie cannot hope to meet her burden of showing that the challenged statements are materially false.[8]

## V.   VALERIE CANNOT PROVE THAT CNN ACTED WITH FAULT

This Court should also grant summary judgment because Valerie cannot carry the burden, as she must, *Carroll v. TheStreet.com, Inc.*, 2014 WL 5474061, at *12 (S.D. Fla. July 10, 2014), of demonstrating that CNN acted with *any* culpable level of fault in airing the Report. No one at CNN believed the Report falsely labeled her a QAnon follower and everyone at CNN testified that they did not depart from their standard practice.

### A.   Valerie Cannot Prove That CNN Acted with Actual Malice

Valerie is a limited public figure who, based on the undisputed record, cannot

---

[8] Valerie's self-serving denials in the SAC are also unavailing because it is a common, Q-approved strategy for QAnon followers to use Q-related catchphrases and iconography while also disclaiming knowledge—or even the existence—of Q. SAC ¶¶ 10, 20; *see* SF ¶ 4. *See, e.g., Schiller*, 2016 WL 9280239, at *10 (granting summary judgment based on substantially true description of plaintiff as an "alcoholic or drug addict" notwithstanding plaintiff's "convenient" disavowals of addiction).

prove by clear and convincing evidence that the allegedly defamatory statement was published with "actual malice." *Silvester v. ABC*, 839 F.2d 1491, 1493 (11th Cir. 1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).

### 1.    Valerie Is a Limited Public Figure

Whether a plaintiff is a public figure is a question of law for the court. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). This Circuit uses a three-part test for identifying a limited public figure. First, the court must determine the existence of a public controversy. *Turner*, 879 F.3d at 1272. Next, the court must consider the plaintiff's participation in the controversy and, finally, the court must determine whether the challenged statements were germane to plaintiff's participation in the controversy. *Silvester*, 839 F.2d at 1494. As this Circuit has recognized, "[t]he purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978);[9] *see also Berisha v. Lawson*, 973 F.3d 1304, 1311 (11th Cir. 2020) ("even if [appellant] never voluntarily sought public attention, federal courts have long made clear that one may occasionally become a public figure even if 'one doesn't choose to be.'"); *Turner*, 879 F.3d at 1273. Valerie plainly is a public figure.

*First*, at the time of CNN's reporting, there was a public controversy, which is

---

[9] Fifth Circuit cases decided before October 1, 1981 are of precedential value in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

defined as "any topic upon which sizeable segments of society have different, strongly held views." *Della-Donna v. Gore Newspapers Co.*, 489 So. 2d 72, 76 (Fla. 2d DCA 1986). "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Id.* (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980)). "A court may not question the legitimacy of the public's concern [because] such an approach would turn courts into censors of what information is relevant to self-government." *Waldbaum*, 627 F.2d at 1296-97. Moreover, "[o]nce a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of *that controversy*." *Friedgood v. Peters Publ'g Co.*, 521 So. 2d 236, 241 (Fla. 4th DCA 1988) (citations omitted; emphasis in original).

Prior to the Report, there existed clear public controversies: (1) the existence of the QAnon movement and "the relationship between the movement and U.S. politics, including Trump and General Flynn"; (2) Q's June 24, 2020, instruction to "take the oath"; and (3) the viral #TakeTheOath movement that ensued online immediately following Q's June 24th directive. SF ¶¶ 17-30. The press had reported extensively on both the role of President Trump, and particularly Gen. Flynn, in promoting QAnon, and there was extensive press coverage of both #TaketheOath and the Flynn families' participation in it. SF ¶¶ 2, 12, 17-28. *See, e.g.*, *Colodny v. Iverson, Yoakum, Papiano & Hatch,* 936 F. Supp. 917, 922 (M.D. Fla. 1996) (Watergate scandal was an "actual public controversy"); *Silvester*, 839 F.2d at 1495 (finding a

public controversy regarding corruption in the jai alai industry based on preexisting newspaper articles). Unsurprisingly, these matters invited public attention and widespread comment. *E.g.*, Exs. 76-77. A public controversy clearly existed in this case.

*Second*, Valerie indisputably played a central role in the controversy. *Turner*, 879 F.3d at 1272. An individual may become a public figure where she "has pursued a course of conduct from which it was *reasonably foreseeable*, at the time of the conduct, that public interest would arise." *Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999) (noting further that such public figures "ha[ve] taken some action ... in circumstances in which a reasonable person would understand that publicity would likely inhere.") (emphasis added); *see*, *e.g.*, *Little v. Breland*, 93 F.3d 755, 758 (11th Cir. 1996) (plaintiff was limited public figure because he chose to assume "the position of leadership at ... an organization involving public scrutiny ... [and h]is hiring, performance, and firing would all be the subject of public concern and debate").

Valerie is precisely this type of public figure. Whether or not Valerie knew that "Where We Go One, We Go All" was the QAnon Slogan, she indisputably was aware that Gen. Flynn—her brother-in-law—was a public figure and the subject of a great deal of news reporting. She also was well aware that the Oath Video was going to be posted to Twitter and fully expected that it would go viral. SF ¶ 25. She actively tracked the popularity of Gen. Flynn's post, asking others in attendance at the July 4 BBQ, "are people seeing it?". *Id*. And the connections between "Where We Go One,

We Go All," #TakeTheOath, and QAnon were well-established prior to July 4, 2020. *Id.* ¶¶ 6-10, 17-18. Indeed, Lori sent Valerie multiple Facebook messages promoting #TakeTheOath and linking to tweets that included #qanon and #wwg1wga. *Id.* ¶¶ 20-21. In sum, Valerie reasonably should have known that by participating in the recorded oath-taking she had "voluntarily engaged in a course that was bound to invite attention and comment." *Rosanova*, 580 F.2d at 861.

*Finally*, there is no question that the challenged portions of the Report are germane to Valerie's participation in the controversies. The Report is about the way in which Trump and Gen. Flynn enabled the widespread growth of the QAnon movement. Valerie's participation in #TakeTheOath movement, a viral trend instigated by Q, is clearly germane to that controversy. Valerie is a limited public figure.

### 2.    CNN Did Not Act With Actual Malice

Valerie must, therefore, meet the "daunting" standard of establishing by clear and convincing evidence that CNN acted with actual malice. *Klayman v. City Pages*, 2015 WL 1546173, at *13 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F. App'x 744 (11th Cir. 2016). The actual malice standard requires plaintiffs to "allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Turner*, 879 F. 3d at 1273. The standard is not satisfied "merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). The question is "whether the

defendant…actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Michel*, 816 F.3d at 703. Thus, even proof of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" will not establish actual malice. *Harte-Hanks*, 491 U.S. at 664-65 & n. 5; *Michel,* 816 F.3d at 703.[10] And, a publisher's reliance on "trustworthy sources demonstrates his lack of subjective belief that the [allegedly defamatory] articles [in suit] contained false statements." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 947 (11th Cir. 2017*); see also, e.g., Rosanova*, 580 F.2d at 862 (no subjective awareness of probable falsity where "the publisher's allegations are supported by a multitude of prior reports upon which the publisher reasonably relied.").

Here, each and every CNN decisionmaker testified that they believed the Report was true when it was published and that they did not intend to state or imply that Valerie (or any of the Flynns for that matter) were QAnon followers. There is *no* evidence in the record—let alone clear and convincing evidence— to contradict this

---

[10] Valerie alleges that CNN's supposed "bias" against the Flynn family and its failure to ask her for comment prior to airing the Report are evidence of actual malice. SAC ¶ 36. There is no evidence of any such bias. And if there was, bias alone is not enough to establish actual malice. *See Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 44 (Fla. 4th DCA 2010) (holding that ill will alone does not amount to actual malice). Moreover, CNN's unrebutted testimony demonstrates that it is *not* biased against the Flynns. Ex. 4 ¶¶ 51, 76, 81; Ex. 6 ¶¶ 33, 37-38; Ex. 8 ¶¶ 26-27, 32. And numerous courts have held that failure to ask for comment or consult with reporting subjects does not evidence actual malice. *See, e.g.*, *Levan*, 190 F.3d at 1243 (rejecting argument that failure to speak with source favorable to plaintiff constituted actual malice). Finally, to the extent Valerie relies on O'Sullivan's light-hearted text message to Ms. Holland that his tweet sharing the Report "will send ratings sky rocketing" to claim actual malice, O'Sullivan's unrebutted testimony demonstrates that he did not produce the Report to impact CNN's ratings, nor was he aware of CNN's ratings. This message reflects no ill will toward Valerie, let alone actual malice. Ex. 4 ¶¶ 67-68.

sworn testimony. In fact, the record establishes the contrary. SF ¶¶ 36-38.

CNN's good-faith belief is supported by the fact that prior to the Report, CNN was aware of public reporting that bolstered the truth of the Report. O'Sullivan was aware that: there was a viral #TakeTheOath movement wherein members of the public posted videos of themselves on Twitter taking the oath of office and reciting the QAnon Slogan; Valerie voluntarily participated in that movement by reciting the oath and QAnon Slogan in a recorded video; Gen. Flynn had published that video on Twitter; published news reports commented on the Flynns' participation in the #TakeTheOath movement, specifically accusing them of promoting QAnon; Valerie made no public comment at the time denying these accusations and took no legal action against any publisher; and that General Flynn and his family had used QAnon to fundraise for the Legal Defense Fund. SF ¶¶ 14-16, 23-29; Ex. 4 ¶ 19. Hogan and Lacey-Bordeaux were also aware that "Where We Go One, We Go All" was closely associated with QAnon and that it was widely reported that Gen. Flynn and his family members had taken a QAnon oath in July 2020. Ex. 6 ¶¶ 25, 27-28; Ex. 8 ¶¶ 22-24.

CNN plainly lacked any subjective belief that the Report contained any false statement. This undisputed fact precludes a finding of actual malice. CNN is entitled to summary judgment on this basis.

### B.  Valerie Cannot Show That CNN Acted Negligently

Even if Valerie were considered a private figure, she cannot show that CNN published the Report with the requisite level of fault. Under Florida law, a private

figure plaintiff must prove "the defendant published the [challenged] statements with negligence [*i.e.*, without reasonable care as to whether the alleged false and defamatory statements were actually true or false.]." *Miami Herald Publ'g Co. v. Ane*, 423 So. 2d 376, 378 (Fla. 3d DCA 1982), *approved*, 458 So. 2d 239 (Fla. 1984).

The undisputed evidence shows that CNN did act with reasonable care in publishing the Report. A media outlet has exercised due care when it "rel[ies] for [its] source[] of information upon other reliable periodicals, newspapers and wire service reports" without otherwise acting negligently. *Nelson v. Associated Press*, 667 F. Supp. 1468, 1477 (S.D. Fla. 1987) (noting that "[t]hese periodicals are an integral part of today's news information services"); *see also Watkins v. Wash. Post*, 2018 WL 805394, at *7 (D. Md. Feb. 9, 2018) ("[R]eporters are not negligent…when relying on other reputable sources."). In producing the Report, CNN specifically relied on articles connecting the Oath Video to QAnon, and was aware generally of the wealth of other similar reporting. SF ¶ 31. CNN, therefore, did not act negligently by including a two-second clip of the Video in the Report and reporting that Gen. Flynn spoke an oath associated with QAnon.

Moreover, where a media organization takes "reasonable precautions to ensure [a report's] accuracy," it will not be found negligent. *Valentine,* 698 F.2d at 432; *see Nelson*, 667 F. Supp. at 1477 (same). In *Valentine,* the record showed that multiple individuals, "including two attorneys, repeatedly reviewed the lyrics" to a song. 698 F.2d at 432. Because the defendant songwriters believed "[plaintiff] was not part of [a] conspiracy and that the song did not depict her as being so," there was

no triable issue as to the reasonable care taken by the defendants. *Id.* Here, as in *Valentine*, the undisputed evidence shows that CNN did take reasonable precautions. The Report was reviewed by numerous CNN employees, including O'Sullivan's editor and producer, the *CNN Tonight* producer, a CNN attorney, and representatives from Standards & Practices and the Row. SF ¶ 36. As in *Valentine,* these individuals had a good faith belief the Report was not about Valerie or her family and did not cast them as QAnon followers. *Id.* ¶ 37. The Chyron exactly matches the Report's script, and pulling from the script is one of the common ways that chyrons are created. *Id.*

There is nothing to contradict those claims. Valerie alleged that the evidence would show gross negligence, failure to exercise care, and abandonment of standards, *see* SAC ¶ 35. But none of that materialized. Valerie has not and cannot establish that CNN acted negligently in telecasting the Report.

## VI.   VALERIE CANNOT PROVE DAMAGES

A defamation plaintiff suing a media defendant must prove actual injury. *Mid-Florida Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985); *see also Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (noting that there are no presumed damages against a media defendant). A defamation plaintiff must also demonstrate that the allegedly defamatory statements proximately caused that injury. *See, e.g.*, *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006). In other words, Valerie must show that the Report is the "sole cause" of her asserted damages. *Wound Care Concepts, Inc. v. Vohra Health Servs. P.A.*, 2022 WL

320952, at *14 (S.D. Fla. Jan. 28, 2022); *Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 2413833, at *5 (M.D. Fla. June 10, 2011) (granting summary judgment based on lack of causation). Here, Valerie cannot carry this burden.

Valerie claims that the Report damaged her reputation by calling her a "QAnon Follower." SAC ¶¶ 19, 28, 30, 32, 40. But she acknowledged that Gen. Flynn first published the Oath Video, and it was *that* video that associated her with QAnon seven months before the Report aired. Ex. 2; Ex. 18 at 115:9-15. Barbara also testified that Gen. Flynn's tarnished reputation predated 2020, and consequently, the entire Flynn family reputation was harmed then too because "[a]nybody who smears one member of [the Flynn] family is smearing all of them." Ex. 128 at 110:14-111:9.

In light of these reputational harms caused by her and her family's own actions—long predating the Report—it is no surprise that Valerie is unable to attribute *any* of her asserted damages solely to the Report. Indeed, Valerie made abundantly clear that she has no financial losses she could attribute to the Report, including out-of-pocket expenses, property damage, and lost wages or customers. Ex. 18 at 40:15-17 ("Q: Did you have any medical expenses associated with the CNN reports? A: No."); *id.* at 42:25-43:9 ("Q: Have you experienced property damage since the report? A: No. Q: Do you have any financial losses as a result of the CNN report that we could use bills or receipts to calculate or quantify? A: Not that I could think of right now."); *id.* at 43:18-23 ("Q: Other than in connection with the lawsuit [...] have you had any out-of-pocket expenses as a result of the CNN's report? A:

No."). Nor does she claim she lost out on positions for which she applied, including a part-time job at the Englewood Chamber of Commerce, because of the Report. *Id.* 34:23-36:23, 38:23-39:4. Valerie also conceded that the Report did not impact, in any way, any wages she received for her temporary work selling merchandise for a ReAwaken America conference, which was her only source of income at the time the Report aired. *Id.* at 40:3-14. Nor did Valerie provide any documentation supporting any economic harm at any time in this litigation. Thus, Valerie has no financial losses, let alone any caused by the Report.

Likewise, Valerie's emotional damages are purely speculative. While she testified to experiencing shock and withdrawal from social media and in person, she also testified that nobody—including family and the broader public—ever reached out or confronted her about the Report, no one called her a "QAnon follower," and no one listed in her initial disclosures thinks any less of her because of the Report.[11] Ex. 18 at 48:17-20; 53:18-20; 80:9-13. And despite her claimed emotional damages, to this day, she does not have any hesitation using her last name publicly and has never sought treatment from a mental health professional. *Id.* at 40:18-25; 47:13-16.

Finally, while Valerie no longer appears to claim special damages, in an apparent attempt to retain the option she persists in asserting "lost future earnings and diminished earning capacity." SAC ¶¶ 37, 42. But as she testified, she has no economic harm whatsoever, let alone an economic loss solely attributable to the

---

[11] Valerie also testified that she does not even know the three individuals listed in her SAC who purportedly "recognized Valerie and understood that the defamatory statements referred to her specifically." Ex. 18 at 145:23-147:4.

Report. Ex. 18 at 43:6-9. Valerie has admitted she has not suffered any special damages, which precludes a claim for defamation *per quod*.

Perhaps most tellingly, Valerie did not even know about the Report until 9 months after it aired when her husband told her about it—specifically to bring this lawsuit.  That, along with Joe Flynn's belief that CNN is the "enemy," Ex. 21 at 18:12-22, calls into question whether the purpose of this lawsuit is to really vindicate an emotional harm or simply to "get CNN." In sum, Valerie cannot meet her burden of proving damages.

## CONCLUSION

For all of the foregoing reasons, CNN respectfully requests that this Court grant its motion for summary judgment and dismiss all claims against it.

Date: October 19, 2023                              Respectfully submitted,

| SHULLMAN FUGATE PLLC | DAVIS WRIGHT TREMAINE LLP |
|---|---|
| By: */s/ Deanna K. Shullman* | Katherine M. Bolger* |
| Deanna K. Shullman (FBN 514462) | Meenakshi Krishnan* |
| Sarah M. Papadelias (FBN 0125098) | Lindsey B. Cherner* |
| 2101 Vista Parkway, Ste. 4006 | Sam F. Cate-Gumpert* |
| West Palm Beach, Florida 33411 | 1251 Avenue of the Americas |
| Telephone: (561) 429-3619 | New York, New York 10020 |
| dshullman@shullmanfugate.com | Telephone: (212) 489-8230 |
| spapadelias@shullmanfugate.com | katebolger@dwt.com |
|  | meenakshikrishnan@dwt.com |
|  | lindseycherner@dwt.com |
|  | samcategumpert@dwt.com |
|  | *Admitted *Pro Hac Vice* |
|  | *Counsel for CNN* |